# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-12-00680-CV

**Vic A. Gardner, Appellant**

**v.**

**Greg Abbott, Attorney General of Texas; The State of Texas; and Glenn Elliott, Individually, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. D-1-GN-09-003804, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment dated July 18, 2013, and substitute the following in its place. The appellant's motion for rehearing is overruled.

Appellant Vic A. Gardner contends that he was forced to quit his job in a child-support call center due to excessive scrutiny by a supervisor who, he alleges, was hostile to his sexual orientation. Asserting claims for employment discrimination under various provisions of the Texas Constitution,[1] Gardner sued his former supervisor, Glenn Elliott; the State of Texas; and Attorney General Greg Abbott in his official capacity (collectively, the State or appellees), seeking

---

[1] Gardner alleged as follows: "Defendants' constructive discharge of Plaintiff violated Plaintiff's right to be free from discrimination because he is gay under the Texas Constitution, including the provisions that protect Texas citizens [sic] right to equal protection, right to privacy, right to substantive due process and provisions of the Texas Equal Rights amendment."

reinstatement, backpay, lost medical and retirement benefits, and injunctive and declaratory relief. The trial court granted the State's plea to the jurisdiction and motion for summary judgment and rendered judgment that Gardner take nothing on his claims. On appeal, Gardner asserts that (1) the trial court abused its discretion in not specifying the grounds on which summary judgment was granted; (2) the appellees were not immune from the requested equitable, declaratory, injunctive, and damages relief; and (3) summary judgment was improper because fact issues exist as to whether he was constructively discharged because of his sexual orientation. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2006, Gardner was hired as a Child Support Officer (CSO) in the Tyler Regional Customer Service Center (Tyler Call Center) for the Office of the Attorney General's Child Support Division (AG's Office). As a CSO in the Tyler Call Center, Gardner's primary responsibility was to respond to routine inquiries and complaints regarding child-support case processing and to transfer or seek additional assistance if further action on a matter was required. A total of 28 CSOs were employed to answer telephones at the Tyler Call Center during Gardner's tenure there.

As conceded by all parties, the job of a CSO is extremely demanding and requires rigorous oversight to meet the following goals, which are mandatory and applicable to child-support call centers statewide: (1) 90% of calls must be answered (i.e., no more than 10% of customers disconnect the call before speaking to a CSO); and (2) the average hold time must not exceed two minutes. To ensure that the call center attains these goals, each CSO is given a call quota, which is determined by length of service in the call center. To help the CSOs manage both the individual and call-center goals, a large electronic board is prominently featured in the call center and acts like a

2

news ticker, displaying how many calls are on hold, the average length of time callers have been holding, and the answer rate. This board serves as a constant visual reminder of call demands and performance expectations.

The following summary-judgment evidence is essentially uncontroverted. Due to the high call volume on most days, CSOs typically spend 40 hours per week on the telephone, taking calls in close succession and often dealing with unhappy callers. Because the job can be stressful, applicants for CSO positions are informed during the application process that the job is demanding and that CSOs are closely monitored by supervisors for policy compliance to help ensure that employees stay on task so that quotas and goals are satisfied. It is undisputed that strict monitoring is regularly utilized to ensure the call center's objectives are met. Supervisors make note of arrival time, length of lunch breaks, the length of each call answered, the number of calls answered, and the length of personal breaks (including restroom visits). In fact, daily reports are generated showing when CSOs sign on and off as being available to take calls, and if an employee signs in more than one minute late, a copy of the report is placed in the employee's personnel file. All breaks, including lunch breaks, are pre-scheduled; hours worked and employee leave are closely monitored; and frequently, there is no time for unscheduled breaks. Due to strict monitoring, supervisors are aware of and make note of employee violations, some of which might seem minor in many employment settings but are viewed as significant in the intense call-center environment. This is so because the amount of missed or idle time can have a significant impact on the ability of the call center to meet its goals. As Gardner's supervisor, Erin Henriksen, testified, "If every CSO is 30 seconds late in signing onto the phones, more than 14 minutes of work time is lost and as many as 200 calls could be missed."

3

In addition to having their work behavior monitored, the calls the CSOs answer are recorded and regularly "graded" for compliance with AG's Office policies. An employee may receive a grade deduction on a call for a wide variety of deficiencies, including not asking for the customer's contact number, failing to use appropriate responses, failing to use empathetic phrasing, failing to transfer a call when additional assistance is required, inappropriately transferring a call that the CSO should have been able to resolve, and inadequate processing procedures. A relatively small number of calls are monitored on a monthly basis for each employee, and a satisfactory score for calls is 90 or better.

In addition to the foregoing procedures, various initiatives are implemented from time to time to help drive call-center efficiency and customer satisfaction. As part of these initiatives, additional calls meeting other specified criteria are monitored and graded. For example, in January 2009 an initiative (January 2009 initiative) was implemented to reduce the number of calls unnecessarily transferred out of the call center to the field office. In connection with that initiative, all calls during a two-day period that were one minute or less in duration and that were transferred out were reviewed and graded to determine whether the transfer was warranted. Unlike the regular monthly monitoring of calls, every call during the two-day period meeting the initiative criteria was graded, and the number of graded calls for any particular CSO was dependent on how many of that employee's calls met the stated criteria.

If a monitored call receives an unsatisfactory score, or if a CSO violates the call center's policies, the employee is subject to discipline under a progressive discipline structure that ranges from oral and written warnings up to and including termination for repeated violations or egregious first-time violations. Policy violations and low call scores are also taken into

4

consideration during annual employee evaluations. In the annual evaluations, employees are rated on customer service (as determined by observations of both monitored and non-monitored calls); "partners in quality" (based on average scores of monitored calls); answering incoming calls (based on the average number of calls answered per day); appropriate handling of "locate" information (which involves appropriately documenting information in the call center's computer system); resolving customer inquiries (based in part on the CSO's ability to resolve the customer's problem without transferring or obtaining additional assistance or only doing so when appropriate for the matter); teamwork; punctuality and leave; confidentiality; and standards and ethics. The highest score available in each category and overall is "outstanding," which is followed by "very good," "satisfactory," "needs improvement," and "unsatisfactory."

While Gardner was employed at the Tyler Call Center, Henriksen was his immediate supervisor, and Elliott was the call-center manager. Both Henriksen and Elliott monitored the activities in the call center, but disciplinary reports and annual evaluations were principally prepared by Henriksen and submitted to Elliott for his review. It is undisputed that Gardner received oral and written disciplinary warnings from Henriksen on several occasions but nevertheless received high scores on his annual evaluations.

The record reflects that, while employed as a CSO, Gardner received the following written and oral warnings: (1) written warning in July 2007 for poor performance on a call with a customer and violation of the personal internet usage policy; (2) written warning in June 2008 for failing to treat members of the public and fellow employees with dignity and respect and excessive

5

conversations with field office employees during call transfers;[2] (3) written warning for excessive idle time and time away from his desk in August 2008; (4) written warning and counseling following the January 2009 initiative for inappropriately transferring 17 of 21 calls, spending too much time talking on the phone during call transfers, and making racist, profane, and unprofessional comments during several of the monitored calls;[3] and (5) counseled at some unspecified time for referring to customers as "whores on hold" and stating that single-mother customers needed to refrain from "clipping their toenails on ceiling fans." Although provided an opportunity to comment in writing on disciplinary matters, Gardner only objected to the August 2008 write-up concerning his excessive idle time and desk absences. Other than the August 2008 disciplinary write-up, Gardner has not

---

[2] As noted in the disciplinary report, Gardner was disciplined for inappropriate comments and poor call handling, including the following:

(1) excessive conversation with an employee in a field office during a call transfer (over 2 minutes of chat time on a call that lasted a total of 3:02 minutes in one call and more than 1 minute of chat time in another call);

(2) referring to a manager in the field office as "Hitler" and stating that he would put a "bushel of mistletoe" on his "coattail" for that manager; and

(3) complaining during a call transfer to the field office that he had been warned about talking too long during call transfers and remarking to a former co-worker, "I can't talk to anybody. Isn't that retarded? . . . You haven't forgotten how this place is ran [sic]? Blessing to get out. I've had it."

[3] Some of the comments to the field-office employees included: "I'm having a nervous breakdown. Isn't this crazy? My last caller told me to shut the F up. . . . Y'all are all so smart-assey in Texarkana. . . . I don't give a shit. . . . I'm getting the Hell out of this shit. . . . Dillard's has offered me a full-time job–we're going to talk. I could have stayed in bed this morning, but if I would have sicked out, I would have gotten my ass reamed out. . . . Some of our customers have nothing better to do than sit on their ass waiting on a check. . . . It's been a bitch, hadn't [sic] it?" He was also heard making what have been characterized as racist, stereotypical comments about a customer with an Asian name possibly being the sister of an Asian employee in the field office.

disputed that he was appropriately disciplined; he has only alleged that discipline was not consistently meted out for like conduct, as far as he knows,[4] and that his supervisors, Elliott and Henriksen, engaged in derogatory talk similar to that for which he was disciplined.[5]

In addition to the foregoing interim disciplinary matters, Gardner was formally evaluated twice during his tenure at the call center—in April 2007 and April 2008—and his overall evaluation both times was "very good." His evaluation in each component remained the same year-over-year, except that "partners in quality" rose from "satisfactory" to "very good" in 2008 and "locate" dropped from "outstanding" to "very good." Although areas of needed improvement were noted each year—including the need to improve customer-service skills and not missing work on heavy call days—Gardner's annual reviews were mostly positive. There are notations in each review about Gardner's late arrivals/sign-ons, and Gardner was admonished in 2007 for failing to promptly notify management if he would be unexpectedly late and praised in 2008 for always doing so. In 2008, there is a further notation that Gardner had been spending too much time socializing with coworkers in the office and on the phone. Although provided an opportunity to comment in writing on these reviews, Gardner provided no responsive comments.

In addition to his positive annual evaluations, Elliott recommended Gardner for a one-time merit pay raise in May 2008. Elliott's request was granted and made effective in the summer of 2008.

---

[4] On rehearing, Gardner asserts that we ignored his testimony denying that he engaged in most of the conduct of which he was accused. The record citations provided in the motion for rehearing do not support this characterization of Gardner's testimony nor does the remainder of the record.

[5] Although Elliott disputes that he used any such derogatory language and has denied hearing others use such language, we take Gardner's testimony as true for purposes of our review.

7

Despite receiving at least some positive feedback, Gardner, who self-identifies as homosexual, began to suspect that Elliott was hostile to his sexual orientation. His suspicion was first raised following a work-related costume event in October 2007 and was further bolstered by subsequent events. In October 2007, Gardner arrived at the costume event dressed as a geisha girl, and he contends that Elliott repeatedly referred to him derogatorily as a "Geisha Guy" and then failed to include a photo of Gardner in costume when photos of other costumed employees were distributed to the office. When Gardner called the omission to Elliott's attention, Elliott explained that he was having trouble uploading the photo and would try to resend. Gardner, however, got the impression that Elliott did not want to distribute the photo.[6] For the October 2008 costume event, Gardner came dressed as a ballerina. He believes that Elliot took issue with this costume because another employee, who was also homosexual, said that Elliott would "fall out" when he saw Gardner's costume. There is no allegation that Gardner was not included in any photo distribution following the October 2008 event or that Elliott himself actually made any comment about Gardner's ballerina costume.

Gardner also maintains that, during a casual conversation that occurred around June 1, 2008, Elliott, who is a member of a Baptist church, asked Gardner how his father, who was

---

[6] Although there is some evidence that Gardner's photograph in the geisha girl costume was included in an internal agency newsletter, there is no evidence directly disputing Gardner's claim that Elliott did not distribute his photograph.

a Baptist preacher, felt about his lifestyle.[7]  Gardner testified that he felt that this conversation was discriminatory because heterosexual people are not asked how their parents feel about their lifestyles.

In June 2008, Gardner contends that Elliott threatened his job because Gardner was joking during call transfers to the field office and talking too long.[8]  This appears to have been in connection with the written warning Gardner received around the same time.  Following this incident, Gardner contacted an ombudsman at the AG's Office to complain about Elliott's management style.  In an undated, unaddressed email that Gardner reportedly sent to the ombudsman, Gardner stated that Elliott was harassing him by calling him into his office and sending emails that would not stop until Gardner started ignoring them.  Gardner's email further complained about Elliott's threatening his job.  He expressed displeasure with his work environment, stating that it was no longer pleasant to work there and it felt threatening.  He further expressed that neither he nor his coworkers could enjoy working in the call center due to the hostile environment Elliott's management style created.  He noted that the stressful environment was leading to high turnover and further observed that some employees had been fired.  He closed by stating, "I am a single gay man and feel that this is a problem for my manager [Elliott]."  As the basis for this belief, he referenced Elliott's "Geisha Guy" comments at the October 2007 costume event and the fact that Elliott had not

---

[7]  Elliott testified that this conversation actually took place the day of either the 2007 or 2008 costume events and was precipitated by Gardner's comment that his father was going to have a "stroke" over his costume.  Elliott did not recall whether it was he or someone else who asked if Gardner's father took issue with his lifestyle.  To the extent the variance in recollection is material, we view the evidence in the light most favorable to Gardner.  *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

[8]  According to Gardner, every time he was disciplined or counseled, Elliott would say it would be up to others in the AG's Office in Austin as to whether Gardner would continue to have a job.  There is no indication that Elliott expressed something different on this occasion.

included a photo of him in costume when he distributed photos from the party. He did not reference any other specific incidents. The ombudsman advised Gardner to take his complaints up the chain of command to Elliott's supervisor.

In response, Gardner scheduled a meeting with Elliott's supervisor, Chip Arnold, at the beginning of July 2008.[9] During that meeting, Gardner again complained about Elliott's "harsh" management style. He said that Elliott micromanaged him, which he described as watching everything he did, looking into his computer, and reading his emails. He asserted that he felt harassed by this behavior and that other employees likewise felt harassed and "stressed out" by the environment Elliott created by walking the aisles and watching everyone. He complained that Elliott's behavior made the work environment unenjoyable for everyone. When asked for specific instances, Gardner offered that Elliott questioned him when he was absent from his desk due to stomach trouble and had used more than the allotted idle time; Gardner believed this was none of Elliott's business. He also said that Elliott questioned him on another occasion when he was not ready to answer calls at 8:00 in the morning because he was eating crackers and still had food in his mouth. There is no evidence that, at this meeting, Gardner advised Arnold of his belief that he was being subjected to excessive scrutiny based on his sexual orientation, and Arnold affirmatively testified that Gardner did not. Arnold testified that he advised Gardner that it was Elliott's job to closely monitor employee behavior in the call center and further told him that the things he

---

[9] Arnold testified that the ombudsman had contacted him about Gardner's complaint and asked him to look into it. The record reflects that, at the time Gardner initially complained to the ombudsman, Arnold was out of the office for medical reasons but that he contacted Gardner to schedule a meeting as soon as he returned to work.

complained about were part of Elliott's job and were to be expected due to the demanding nature of a call center.

Arnold also recommended that Gardner and Elliott meet together, which they did shortly thereafter. Gardner contends that, at that meeting, Elliott was upset by Gardner's complaint to Arnold. He says that Elliott yelled at him, banged his hand on the desk, denied being a liar, stated that he was not out to get him, and that he wanted to be "friends" with Gardner. Gardner said he told Elliott that he was not going to change his impression about Elliott's work style despite his protestations. Gardner later testified that he thought it was odd that Elliott had expressed a desire to be friends.

Gardner's next interaction with Arnold occurred in August 2008, when he emailed Arnold a written response he wrote after he was disciplined for excessive idle time and time away from his desk. The response was also emailed to Elliott, who forwarded it to the ombudsman after Gardner resigned. In the email response, Gardner explained his reasons for being absent from his desk and touted his job performance, although he did acknowledge that he engaged in personal talk in the office. However, despite acknowledging the asserted behavior, he observed that he was still meeting his call quotas and was thus not "burdening" his coworkers, who he alleged also engaged in idle conversation. He also indicated that he had sought assistance for work-related stress through an employer-sponsored program. He closed with a complaint that he felt like he was "harassed every day when I come to this office." In this written response, he did not reference any inappropriate actions, activities, or comments or refer to disparate treatment based on his sexual orientation. Gardner testified that he never received a response from Arnold. Around the same time, Gardner

11

may also have contacted the ombudsman; the record is unclear, however, as to what may have been communicated between Gardner and the ombudsman at that time.

Evidently, Gardner had no significant work-related complaints between September 2008 and January 2009, but things changed at the start of the new year. On January 13, 2009, Gardner was counseled by Elliott and Henriksen for (1) unnecessarily transferring 17 of 21 calls during the January 2009 initiative, (2) averaging a 51.49 on the transferred calls, (3) using sexist, racist, profane, and unprofessional comments during several of the monitored calls,[10] (4) engaging in idle conversation during call transfers that caused customers to hold unnecessarily for extended periods of time and wasted the field-office employees' time, and (5) using the internet for personal reasons while calls were on hold and waiting to be answered, in violation of the internet-use policy. Unbeknownst to Gardner, Elliott had on the same day initiated preliminary steps to recommend that Gardner's employment be terminated, citing Gardner's unwillingness or inability to address previously expressed concerns about making himself unavailable to take waiting calls and engaging in personal talk while phone-based customers were on hold waiting to be assisted.

On January 22, 2009, Gardner tendered his resignation. On the same day, he filed a written complaint with the ombudsman alleging that he was harassed and singled out for scrutiny by Elliott. In his written complaint, he referenced the July 2008 meetings with Arnold and Elliott, the August 28 write-up for idle time and personal talk, and the response he emailed to Arnold in August 2008. He stated that "[a]fter that incident in August and September [Elliott] has left me alone until recently." Referring to the January 13 disciplinary write-up, Gardner said "I don't have

_____

[10] During the calls, Gardner was heard saying that he was planning to quit and had been offered a full-time job at Dillard's where he had been working part-time as a shoe salesperson.

12

a problem with the write up." He claimed, however, that at the end of the counseling session, Elliott told him "you are who [you] are and you're just being Vic, but don't be so OUT at work."[11] (Emphasis in original.) He felt that this statement was an inappropriate and unprofessional reference to his sexual orientation, and he further complained about the stress Elliott caused as the call-center manager. He asked that his complaint be resolved by removing Elliott as manager of the call center.

In November 2009, Gardner sued Elliott, Abbott, and the State of Texas, asserting claims under various provisions of the Texas Constitution. Gardner alleged that he was constructively discharged based on his sexual orientation and he sought "injunctive relief" in the form of (1) reinstatement to a comparable position; (2) an order precluding the appellees from discriminating against him on the basis of his sexual orientation following reinstatement; (3) an order directing the appellees to pay him back pay from the date of his constructive discharge through the date of his reinstatement; (4) a declaration that his right to be free from sexual-orientation discrimination was violated; and (5) reasonable and necessary attorney's fees.

After filing a general denial and asserting several affirmative defenses, the State filed a plea to the jurisdiction challenging the availability of some of the requested remedies based on the State's immunity from suits for money damages. The State also argued that, as a matter of law, (1) there is no private right of action for money to remedy the particular constitutional violations alleged in Gardner's lawsuit, and (2) Gardner's request for an injunction mandating reinstatement

---

[11] Elliott denies that he made this comment. Henriksen, the only other person Gardner identified as being present at the meeting, concurred in Elliott's recollection. In her affidavit, she averred that "Mr. Elliott acknowledged that Mr. Gardner is very friendly and talkative and told him that it was okay to say hello, but that he should quickly move on to the purpose of the call. Mr. Elliot[t] said something like, 'Don't be so Vic. Just a quick hello . . . how-are-ya . . . okay, are you ready for the case number.'" Because this evidence is disputed, we take Gardner's version of events as true for purposes of our review.

and nondiscrimination following reinstatement would be ineffective against Elliott in his individual capacity and should have been asserted against him in his official capacity. The plea was based exclusively on the claims made in Gardner's original petition; no supporting evidence was attached.

The trial court granted the plea to the jurisdiction in an interlocutory order, and more than a year later, Gardner amended his petition to add a request for "injunctive relief" conferring coverage of or reimbursement for medical bills incurred following his resignation and compensating him for loss of benefits following his resignation. In response, the State filed a second plea to the jurisdiction, asserting the same arguments for relief that were asserted in its first jurisdictional challenge. As in the first plea to the jurisdiction, the State did not assert a jurisdictional bar to Gardner's request for reinstatement and an injunction precluding further discrimination; as to those claims for injunctive relief, the second plea challenged only the effectiveness of such relief against Elliott in his individual capacity.

While the second plea to the jurisdiction was pending, the State filed a combined traditional and no-evidence motion for summary judgment on a number of grounds, including the following: (1) no evidence that Gardner was constructively discharged; (2) no substantive right to employment as a matter of law; (3) no evidence to support Gardner's equal-protection claim; (4) no denial of equal protection as a matter of law; (5) no violation of Gardner's right to privacy as a matter of law; and (6) the Texas Commission on Human Rights Act provides Gardner's exclusive remedy for invidious workplace discrimination.

14

Gardner filed a responsive motion with supporting evidence.[12]  In his deposition, which was attached to the response, Gardner elaborated on his discrimination claims beyond the specific incidents previously recounted.  Gardner testified that after the October 2007 costume event, he began feeling like he was being excessively scrutinized in the workplace by Elliott.  Although he affirmed that Henriksen had instituted the vast majority of the disciplinary actions, Gardner did not believe that Henriksen discriminated against him; however, he believed Henriksen was acting as Elliott's pawn.  He testified that many other CSOs felt harassed by Elliott's close monitoring and "micromanagement," including heterosexual employees.  He also verified that close scrutiny was par for the course in the call center.  However, he believed that he was being singled out for closer scrutiny on a more regular basis than his co-workers.

As additional evidence of closer scrutiny, Gardner complained that there were several incidents when he went to the restroom and Elliott also came to the restroom at the same time.  He also said that Elliott once questioned him about what he was doing when he appeared to be distracted from his work while he was inputting contacts into a new cell phone while answering calls.  It is unclear whether Gardner complained about this incident to anyone, but he cites it as an instance of excessive scrutiny.  He further pointed to two occasions on which he had more calls monitored than other employees—17 monitored calls over two days in August 2008 and 21 monitored calls over two days in January 2009.  Gardner testified that the employee who graded his calls in August 2008

---

[12] Gardner also objected to some of the State's summary-judgment evidence, but he failed to obtain a ruling on those objections.  To the extent we could infer that the trial court implicitly overruled his objections, Gardner does not complain on appeal that the trial court erred in overruling the objections.  Therefore, the issue is waived. *See Secure Comm, Inc. v. Anderson*, 31 S.W.3d 428, 430-31 (Tex. App.—Austin 2000, no pet.) (holding that appellant waives right to complain of ruling to which no error was assigned).

15

apologized to him for doing so and said that Elliott had instructed her to grade the calls and to comb through them looking for any errors. There is no other evidence concerning the circumstances of the August 2008 call monitoring or whether Gardner suffered adverse consequences as a result. In comparison, the State produced uncontroverted evidence that the 21 calls that were monitored in January 2009 were part of the initiative to reduce unnecessary call transfers and that Gardner had more calls monitored because he had the most transferred calls that met the initiative criteria. Other than these specific incidents, Gardner generally felt that Elliott watched him more than other employees, reviewed more of his calls, and reviewed more of his emails. Although Gardner understood that it was Elliott's job to do these things, his impression was that Elliott was doing them more frequently to Gardner and that Henriksen was acting under Elliott's orders in more closely scrutinizing his activities. Gardner testified that other employees agreed with him that he was being harassed.[13]

The trial court granted both the State's second plea to the jurisdiction and its summary-judgment motion, without stating the basis for its ruling, and rendered final judgment that Gardner take nothing on his claims. Gardner's motion for new trial was overruled by operation of law.

In four issues on appeal, Gardner complains that (1) the trial court abused its discretion in not specifying the grounds on which summary judgment was granted; (2) the appellees were not immune from the requested equitable, declaratory, injunctive, and damages relief; (3) fact

---

[13] Gardner's deposition testimony is replete with hearsay statements allegedly made by current and former coworkers—both affirmative statements and statements allegedly made in agreement with Gardner's own hearsay statements. The State, however, did not object to Gardner's summary-judgment evidence. Accordingly, we consider all probative evidence regardless of whether it might otherwise meet the definition of hearsay.

16

issues exist as to whether Gardner's sexual orientation was a motivating factor in the State's constructive discharge of him; and (4) fact issues exist as to whether Gardner was constructively discharged because of his sexual orientation. We confine our discussion to issues one and four because those issues are dispositive of Gardner's claims on appeal. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## DISCUSSION

In his first appellate issue, Gardner asserts that the trial court abused its discretion in granting summary judgment without stating the grounds on which it based its ruling. We hold that two well-established summary-judgment principles are fatal to Gardner's argument.

First, our summary-judgment jurisprudence has long required that, when the trial court does not state the grounds on which summary judgment was granted, we must affirm the judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). A requirement that the trial court state its reasons for granting summary judgment is discordant with this principle.

Second, although rule 296 of the Texas Rules of Civil Procedure authorizes a party to request findings of fact and conclusions of law following a bench trial, this rule does not apply in the summary-judgment context. *See, e.g.*, *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex. 1997) (holding that findings of fact and legal conclusions are neither necessary nor proper in summary judgment proceeding). Indeed, it is well established that "[f]indings of fact and conclusions of law have no place in a summary judgment proceeding. If

17

summary judgment is proper, there are no facts to find, and the legal conclusions have already been stated in the motion and response." *Willms v. Americas Tire Co., Inc.*, 190 S.W.3d 796, 810 (Tex. App.—Dallas 2006, pet. denied) (internal citations omitted); *see IKB Indus.*, 938 S.W.2d at 441 (same); *Linwood v. NCNB Tex.*, 885 S.W.2d 102, 103 (Tex. 1994) (holding that appellate deadlines are not extended by request for findings of fact and conclusions of law following summary judgment because they "have no place in a summary judgment proceeding"). As these cases suggest, the trial court's precise legal conclusions are neither essential nor particularly germane to the disposition of an appeal from a summary judgment because the grounds for granting summary judgment are limited to those specified in the motion, and such judgments are reviewed de novo. *See*, *e.g.*, *Valence Operating Co. v. Dorsey*, 164 S.W.3d 656, 661 (Tex. 2005); *Knott*, 128 S.W.3d at 215. Although Gardner might prefer for the trial judge to "narrow" the issues on appeal by ruling on each ground stated in the motion for summary judgment, requiring the trial court to do so would have little practical effect in narrowing the appellate issues because (1) denied grounds may be asserted by cross-point on appeal from an order granting summary judgment and (2) in the interest of judicial economy, "an appellate court may consider other grounds that the movant preserved for review and the trial court did not rule on." *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 627 (Tex. 1996). Although Gardner frames the issue in a slightly different vein from *IKB*, *Linwood*, and *Willms*, his substantive complaint is that the trial court failed to specify its legal conclusions, and these cases are dispositive of that issue. Because Gardner has provided us no reason to doubt the continued vitality of those cases, we overrule his first appellate issue.[14]

---

[14] In arguing that the trial court was required to specify the grounds for summary judgment, Gardner relies exclusively on *In re Columbia Medical Center*, 290 S.W.3d 204 (Tex. 2011). That case, however, is procedurally and substantively inapposite. In *Columbia Medical*, the trial court

18

In his fourth appellate issue, Gardner asserts that summary judgment was improper because he presented some evidence that he was constructively discharged and thus suffered an injury from Elliott's allegedly discriminatory conduct.[15]

For remedial purposes, constructive discharge is functionally the same as an actual termination. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004); *Waffle House, Inc. v. Williams*, No. 02-05-00373-CV, 2011 WL 3795224, at *7 (Tex. App.—Fort Worth Aug. 25, 2011, pet. denied) (mem. op.). In determining whether an employee was constructively discharged, the issue is whether "'the employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Baylor Univ. v. Coley*, 221 S.W.3d 599, 605 (Tex. 2007) (affirming pattern jury charge definition of "constructive discharge" as correct statement of law); *accord, e.g.*, *Suders*, 542 U.S. at 141 (defining constructive discharge in

---

had granted a motion for new trial and overturned a jury verdict "in the interests of justice and fairness," but did not further elaborate on the grounds for rejecting the jury's verdict. *Id*. at 209. The Texas Supreme Court held that the trial court's action was arbitrary and an abuse of its discretion because the court failed to detail the reasons for disregarding the jury's verdict. *Id.* at 213. In so holding, the court cited numerous policy reasons, none of which are applicable in a summary-judgment context. As noted by the court in *Columbia Medical*, trial courts have historically had broad discretion to grant new trials sua sponte following a jury verdict, but that discretion is not without limits. Because of the sanctity with which we regard jury verdicts, the court held that a new trial setting aside a jury verdict may not be granted "in the interest of justice" unless the court specifies its reasons. *Id.* at 211-12. The policy concerns addressed by the supreme court in *Columbia Medical* are inapplicable here because summary judgments may only be granted based on legal grounds specifically identified in a motion for summary judgment and the judgments are reviewed de novo on appeal. We are thus unpersuaded that *Columbia Medical* bears on the issue presented here.

[15] The standards for reviewing a summary judgment are well established and undisputed on appeal. *See, e.g.*,*City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *see also Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *see also* Tex. R. Civ. P. 166a(i). Accordingly, we need not rearticulate them for purposes of our analysis.

sexual-harassment case); *Cox v. Waste Mgmt. of Tex., Inc.*, 300 S.W.3d 424, 433 (Tex. App.—Fort Worth 2009, pet. denied) (same). "The test is objective; the question is not whether this employee felt compelled to resign, but whether a reasonable employee would have felt so compelled." *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 n.19 (5th Cir. 1994); *see also Suders*, 542 U.S. at 141 (constructive discharge inquiry is objective); *Cox*, 300 S.W.3d at 435 (constructive discharge claim is analyzed using reasonable-person test, not employee's subjective opinions). "It is necessary to examine the conditions imposed, not the employer's state of mind." *City of Fort Worth v. DeOreo*, 114 S.W.3d 664, 677 (Tex. App.—Fort Worth 2003, no pet.).

The parties do not dispute that the foregoing principles are applicable to this case. They disagree, however, as to the extent of intolerability that must be established when a constructive-discharge claim is based on a hostile work environment. The State asserts that Gardner must show something more than conduct that would minimally qualify as a hostile work environment, but Gardner's counsel asserted at oral argument that it is sufficient if a fact question is raised regarding the existence of a hostile work environment.

For an atmosphere of hostility based on a protected trait to be actionable, the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See, e.g.*, *Suders*, 542 U.S. at 146-47 (articulating hostile-work-environment standard in statutory discrimination case); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 805-06 (Tex. 2010) (discussing constructive discharge and hostile-environment legal standards). In *Waffle House*, the Texas Supreme Court considered a hostile-work-environment claim based on the employee's gender and described the requisites of such a claim as follows:

20

An abusive environment can arise "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'" Courts look to all the circumstances in determining whether a hostile work environment exists, including the frequency of the discriminatory conduct and whether it unreasonably interfered with the employee's work performance. "All of the sexual hostile environment cases decided by the [United States] Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." Accordingly, "single incidents should not be viewed in isolation because it is the cumulative effect of all offensive behavior that creates the work environment."

*Waffle House*, 313 S.W.3d at 806 (internal citations omitted) (alterations in original).

Unlike constructive discharge, a hostile work environment must be both objectively *and* subjectively offensive. *City of Houston v. Fletcher*, 166 S.W.3d 479, 489 (Tex. App.—Eastland 2005, pet. denied). In determining whether an environment is sufficiently hostile or abusive, courts consider the totality of the circumstances, including (1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Id*. A hostile-work-environment claim is designed to address conduct that is so severe or pervasive that it destroys an employee's opportunity to succeed in the workplace. *Id.* The law's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends but does not hinder an employee's performance. *Id.*

In *Suders*, the United States Supreme Court explained that when an employee claims to have been constructively discharged due to an abusive work environment, the constructive-discharge claim "entails *something more*" than is required to establish the existence of a hostile work environment. 542 U.S. at 147. More specifically, the Court stated, "A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have

21

felt compelled to resign." *Id.*; *see also Waffle House*, 2011 WL 3795224, at *15-16 (on remand, court of appeals relied on *Suders* for proposition that constructive-discharge claim entails something more than what is required to establish hostile-work-environment claim). The Fifth Circuit has explained that this means that, "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Prods.*, 968 F.2d 427 (5th Cir. 1992), *aff'd on other grounds*, 511 U.S. 244 (1994) (severe sexual harassment uncontested but constructive discharge not conclusively established because there was some evidence of prompt remedial action and that plaintiff quit because of coworkers rather than sexual harassment).

In arguing that evidence of a hostile work environment is sufficient to raise a fact issue on constructive discharge, Gardner's counsel generally referenced three cases as equating hostile work environment and constructive discharge—*City of Fort Worth v. DeOreo*, 114 S.W.3d 664 (Tex. App.—Fort Worth 2003, no pet.), *Brown v. Montgomery Cty. Hosp. Dist.*, 929 S.W.2d 577, 582 (Tex. App.—Beaumont 1996), *rev'd*, 929 S.W.2d 501 (Tex. 1998), and the lower court's opinion on remand in *Waffle House*, 2011 WL 3795224 at *15-16. Although we question whether any of these cases can be read in the manner Gardner suggests, we conclude that Gardner's claim fails as a matter of law even under the standard he proposes.

Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but a number of factors have been identified as bearing on this inquiry. Those factors include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (6) offers of early retirement that would make the

22

employee worse off whether the offers were accepted or not. *See, e.g.*, *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 481-82 (5th Cir. 2008). In addition, evidence that an employee was forced to choose between resigning or being fired may be sufficient to raise a fact issue regarding constructive discharge. *Brown*, 929 S.W.2d at 582; *see also Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 321 (5th Cir. 1997) (employer told plaintiff that he would not be retained, would be placed on indefinite unpaid leave, and needed to find another job).

Gardner also cites an employer's failure to inform the employee about the results of a harassment investigation as being another factor supporting a claim of constructive discharge. In support of this factor, Gardner cites *Dillard Dept. Stores, Inc. v. Gonzales*, 72 S.W.3d 398 (Tex. App.—El Paso 2002, pet. denied), in which the court held that a jury could reasonably have concluded that an employee who complained about sexual harassment, was denied a requested transfer from the alleged supervisor's department, and was never informed of the results of any investigation was constructively discharged because he "felt he had no alternative but to 'remain in the department, endure [the harrasser's] conduct, and accept whatever happens in order to keep [his] job.'" *Id.* at 410 (second alteration in original). We do not read *Dillard* as establishing evidence of failure to inform as independently sufficient to raise a fact issue regarding constructive discharge; however, we agree that failure to inform may be considered along with other alleged circumstances in determining whether there is some evidence of an objectively intolerable work environment.

In the present case, there is no evidence of demotion, a change in job responsibility, or that Gardner was given a Hobson's choice between termination and resignation.[16] There is

[16] On rehearing, Gardner cites three cases for the proposition that an employee can establish constructive discharge by showing that he or she faced a choice between resigning or being fired and asserts that we failed to give controlling weight to this authority. *See, e.g.*, *Faruki v. Parsons S.I.P.,*

23

likewise no allegation of a reduction in salary or benefits; indeed, the uncontroverted evidence establishes that Gardner's salary was actually increased after he says Elliott learned of his sexual orientation and that the increase was based on Elliott's recommendation. Rather, Gardner's argument is principally that he was badgered, harassed, or humiliated by Elliott based on his sexual orientation and in a manner calculated to encourage his resignation. He also complains that he was not informed about the results of any investigation into his August 2008 complaint regarding being written up for excessive idle time and absences from his desk.[17]

---

*Inc.*, 123 F.3d 315, 319 (5th Cir. 1997); *McGregor v. United Healthcare Servs., Inc.*, No. H-08-2340, 2010 WL 3082293, at *4 (S.D. Tex. Aug. 6, 2010); *Denner v. Texas Dept. of Criminal Justice*, No. SA-05-CA-184-XR, 2006 WL 2987719, * 3-4 (W.D. Tex. Oct. 16, 2006). Unlike the parties in the cited cases, however, Gardner was not given a choice between being fired or resigning.

In *Faruki*, the court found sufficient evidence of constructive discharge because the plaintiff was told that he should find another job within one week. *Faruki*, 123 F.3d at 319. In *McGregor*, a disability discrimination case, the court concluded that a choice between missing a regularly scheduled physical-therapy session or being fired was "sufficiently synonymous with the ultimatum found in *Faruki* to constitute a constructive discharge." *McGregor*, 2010 WL 3082293, at *4. Gardner alleges that this authority compels the same result in his case.

In the present case, Gardner testified that over the course of his two-year tenure at the call center, every time Elliott counseled him for a disciplinary matter, Gardner was worried about what would happen to his job and Elliott would say he did not know if Gardner would have a job because that would be up to someone else at the AG's office in Austin. This is not evidence of an ultimatum or even a threat of discharge. Indeed, Gardner alleges that the same statement was made to him multiple times over a period of years without any such consequence ensuing. Moreover, although Elliott began initiating proceedings to terminate Gardner's employment shortly before he resigned, Gardner concedes that he was unaware of any effort to terminate his employment, which further makes this case distinguishable from *Denner*, 2006 WL 2987719, * 3-4 (plaintiff who resigned during course of grievance process she instituted after being recommended for termination presented some evidence to support constructive discharge finding where she was told "you have three ways to resign or else you'll be fired," even though decision-maker at that grievance level might not have been the final decision-maker); *see also City of Fort Worth v. DeOreo*, 114 S.W.3d 664, 677 (Tex. App.—Fort Worth 2003, no pet.) ("It is necessary to examine the conditions imposed, not the employer's state of mind.").

[17] The uncontroverted evidence shows that after Gardner complained to the ombudsman in June 2008, she referred him to Elliott's supervisor, Chip Arnold, who met with Gardner and addressed his complaints in person. Gardner's next complaint was via an email sent to Elliott,

Although Gardner generally testified that Elliott regularly subjected him to more excessive scrutiny than other employees and regularly harassed him and that other employees agreed that Gardner was being harassed or "persecuted," such conclusory statements and allegations are insufficient to raise a fact issue: "If a witness provides a conclusion but does not provide underlying facts to support the conclusion, then the witness's testimony is conclusory and legally insufficient to support a judgment."[18] *Ortega v. Cach, LLC*, 396 S.W.3d 622, 637 (Tex. App.—-Houston [14th Dist.] 2013, no pet.) (Frost, J., dissenting); *see also Ryland Group v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam) (holding affiant's statement that certain conduct constituted intentional or willful misconduct by defendant was conclusory because it stated conclusion and did not provide supporting facts); *Texas Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) ("[Plaintiff's] subjective beliefs are no more than conclusions and are not competent summary judgment evidence."); *C.A. Partners v. Spears*, 274 S.W.3d 51, 63 (Tex. App.—Houston [14th Dist.], pet. denied) ("Conclusory statements in an affidavit unsupported by facts are insufficient to defeat summary judgment."). Therefore, in evaluating whether there is some evidence that Gardner's

Arnold, and possibly the ombudsman in August 2008 following a written warning that he considered to be unwarranted. He did not reference his sexual orientation or complain of actions he believed to be based on his sexual orientation. Gardner contends that he received no response to that complaint, and the record does not show what, if any, action was taken with regard to that complaint. Gardner testified that his final complaint to the ombudsman was made after he had submitted his resignation and, thus, any failure to inform him regarding the results of an investigation of that complaint cannot reasonably be considered a factor in his constructive-discharge claim.

[18] Gardner also generally testified that he had applied for other positions in the AG's Office outside the Tyler Call Center but was not selected for any of those jobs, except for one job in Dallas that he did not want to take it even though it would have taken him out of the child-support office because "[i]t was the same type of job: answering the phone" and he did not want to answer phones anymore. With regard to the other positions for which he applied and did not receive a job offer, there is no evidence concerning the nature of those positions, Gardner's qualifications for the positions, or the people who were awarded the positions over Gardner.

work environment was objectively intolerable, we consider only the instances of harassing conduct and micromanagement that Gardner has identified factually.[19]

Viewing the disputed and uncontroverted evidence in Gardner's favor, as we must, the specific incidents of harassment and micromanagement identified by Gardner are: (1) Elliott's derogatory reference in October 2007 to Gardner's geisha girl costume; (2) Elliott's failure in October 2007 to distribute a photograph of Gardner in costume; (3) Elliott's asking Gardner in June 2008 how his father felt about his lifestyle; (4) Elliott's questioning Gardner sometime prior to July 2008 about being unavailable to take calls on an occasion when Gardner spent unscheduled, additional time on a restroom break due to a stomach illness; (5) Elliott's questioning Gardner sometime prior to July 2008 about not being ready to take calls at the start of a work shift when Gardner had crackers in his mouth; (6) Elliott's questioning Gardner on another occasion when he was inputting contacts into a new cell phone while answering calls; (7) Gardner's having been

---

[19] On rehearing, Gardner suggests that we are required to accept his testimony that he was regularly harassed and micromanaged as evidence of constructive discharge because the defendants failed to object to his testimony on the grounds that it was conclusory. However, even without an objection, conclusory opinion testimony is not evidence that could support a judgment. *See, e.g., City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) ("Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence."); *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (observing that "conclusory or speculative" opinions are "'incompetent evidence' . . . [that] cannot support a judgment"); *Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 380 (Tex. 1956) ("It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection."); *Casualty Underwriters v. Rhone*, 132 S.W.2d 97, 99 (Tex. 1939) (holding that "bare conclusions" of lay fact witnesses did not "amount to any evidence at all," and that "the fact that they were admitted without objection add[ed] nothing to their probative force"). We agree with Gardner that testimony is not conclusory when it recites some facts and gives details that can be rebutted. And, as previously stated, we have considered all instances of harassing conduct and micromanagement that Gardner has identified factually; other than that, Gardner's subjective opinions—even if his co-workers shared those opinions as he contends—is not evidence that raises a fact issue concerning the objective reasonableness of his constructive-discharge claim.

26

disciplined in August 2008 for excessive idle time and absences from his desk even though he was still meeting his individual call quota and other employees also engaged in idle conversation; (8) the failure of Elliott, Arnold, or the ombudsman to investigate or respond to Gardner's complaint in August 2008 following his having been disciplined for excessive idle time and absences from his desk; (9) Gardner's having 17 calls monitored and graded in two days in August 2008 without explanation and telling an employee to comb through them looking for errors; (10) Elliott's presumed disapproval in October 2008 of Gardner's ballerina costume; (11) Gardner's having 21 calls monitored in two days during the January 2009 initiative; (12) Elliott's telling Gardner during a disciplinary counseling session in January 2009 not to be so "out" (which Gardner took as a reference to his sexual orientation); and (13) Elliott's telling Gardner every time they had a meeting during his two-year tenure at the Tyler Call Center that Elliott did not know if Gardner would still have a job because that would be up to other people at the AG's Office in Austin.[20]  Although Gardner concedes that he was unaware of any effort to terminate his employment in January 2009,

---

[20] On rehearing, Gardner contends that we "inexplicably" failed to consider evidence of a second incident when Elliott allegedly told Gardner not to be so "out" at work. There is, however, no such evidence. Although Gardner, himself, testified about only a single occurrence of the alleged statement in January 2009, he now contends that testimony from Elliott's supervisor, Chip Arnold, is some evidence that Elliott made a similar statement on another occasion in July 2008. This characterization of the evidence is not supported by the record. Arnold testified to having been informed about only one such incident and repeatedly denied being able to recall any specific date as to when Gardner informed him about Elliott having made the alleged statement. In comparison, the record includes: (1) Gardner's deposition testimony that the incident occurred in January 2009, (2) Gardner's written complaint to the Attorney General's Employee Ombudsman in which he recounted his complaints against Elliott going back to June 2008 and identified only a single occurrence of the alleged "out" statement on January 13, 2009, and (3) Elliott's deposition in which he was questioned only about the "out" statement as alleged in Gardner's complaint to the ombudsman.

he states that this is further evidence that the foregoing actions were taken with an intent to cause him to resign.

Considering the foregoing circumstances cumulatively, we hold that there is no more than a scintilla of evidence that Gardner was constructively discharged. Considering the frequency, severity, and nature of Gardner's complaints, there is no evidence that the Tyler Call Center was permeated with discriminatory intimidation, ridicule, and insult. There is likewise no evidence of conduct that was physically threatening or humiliating, and no evidence that Gardner's work performance was impeded in any manner. In short, there is legally insufficient evidence of work conditions so intolerable that a reasonable person in Gardner's position would have felt compelled to resign. Indeed, Gardner's allegations are less severe and pervasive than the circumstances in other cases in which courts have found insufficient evidence of a hostile work environment, much less a constructive discharge. *Compare, e.g.*, *Staller v. Service Corp. Int'l*, No. 04-06-00212-CV, 2006 WL 3018039, at *4-5 (Tex. App.—San Antonio Oct. 25, 2006, no pet.) (mem. op.) (affirming summary judgment in sexual-harassment case where plaintiff's supervisors frequently made sexually inappropriate remarks, commented about her breasts, referred to male employees as plaintiff's lovers, stood over her and peered down her shirt, forbade her from dating other employees, repeatedly indicated desire to date her, and once came toward her in menacing fashion as if to touch her sexually), *Garcia v. Schwab*, 967 S.W.2d 883, 885, 887 (Tex. App.—Corpus Christi 1998, no pet.) (affirming summary judgment for employer despite evidence that supervisor stared and commented on plaintiff's breasts, touched his genitals in her presence, discussed sexual matters with her, remarked on her and other women's appearances, insulted and yelled at her, and made repeated sexual references with alleged intent to arouse her), *with Gonzales*, 72 S.W.3d 407-08 (holding

28

evidence sufficient to sustain jury's verdict of hostile work environment and constructive discharge where supervisor hugged plaintiff in a manner that pressed supervisor's penis against him on several occasions, poked employee in buttocks with shoe box, and stroked, rubbed and patted employee in sensual way on several occasions). We overrule Gardner's fourth appellate issue.

Our disposition of appellate issue four moots the issues raised in the plea to the jurisdiction regarding the availability of an injunction awarding money damages against the appellees and the propriety of injunctive relief against Elliott in his individual capacity. Accordingly, we do not reach the remainder of Gardner's issues on appeal.

## CONCLUSION

We hold that (1) the trial court did not abuse its discretion in declining to detail the grounds for granting the State's motion for summary judgment and (2) summary judgment was proper on the ground that there is no evidence that Gardner was constructively discharged. For these reasons, we affirm the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Goodwin and Field

Affirmed on Motion for Rehearing

Filed:   October 24, 2013