**Reversed and Rendered and Opinion filed August 25, 2016.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-15-00024-CV

---

### MICROSOFT CORPORATION, Appellant/Cross-Appellee

### V.

### MICHAEL MERCIECA, Appellee/Cross-Appellant

---

### On Appeal from the 345th District Court
### Travis County, Texas
### Trial Court Cause No. D-1-GN-11-001 030

---

## O P I N I O N

Microsoft Corporation appeals the trial court's judgment in favor of former employee Michael Mercieca in this discrimination and retaliation suit filed under the Texas Commission on Human Rights Act (the "Act"). Microsoft contends that (1) there is no evidence to support a finding of constructive discharge; (2) there is no evidence of actionable retaliation; (3) Mercieca's failure to mitigate his damages precludes an award of back pay; (4) "the compensatory damages are

based solely on legally untenable mental anguish and punitive damages findings;" and (5) the attorney's fees award is based on legally insufficient evidence.

Mercieca cross-appeals and contends that the trial court erroneously applied Texas Labor Code section 21.2585(d) to cap the jury's compensatory and exemplary damages awards at $300,000.

We reverse the trial court's judgment and render a take-nothing judgment in Microsoft's favor because no evidence supports the jury's constructive discharge finding.[1]

## OVERVIEW

Mercieca sued his Microsoft coworker Tracy Rummel in April 2011 alleging that Rummel published false statements accusing Mercieca of sexual harassment. According to Mercieca, these false allegations caused him to experience a hostile work environment and harassment at Microsoft.[2] Mercieca filed an amended petition in September 2011 naming Microsoft as a defendant. Mercieca alleged, among other things, that Microsoft (1) discriminated against him because of his age, gender, and national origin in violation of the Act; (2) sexually harassed him based upon the actions of Mercieca's former manager, Lori Aulds; and (3) retaliated against Mercieca after he filed a formal complaint against his management team.[3]

A jury trial was held from April 22, 2014, to May 7, 2014. The jury rejected

---

[1] This appeal was transferred to the Fourteenth Court of Appeals from the Third Court of Appeals. In cases transferred by the Supreme Court of Texas from one court of appeals to another, the transferee court must decide the case in accordance with the precedent of the transferor court under the principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court. *See* Tex. R. App. P. 41.3.

[2] Rummel is not a party to this appeal.

[3] Mercieca also sued Aulds individually but later non-suited all claims against her.

Mercieca's discrimination claim. The jury found in favor of Mercieca on his retaliation claim premised on a finding of constructive discharge and awarded him $623,065 in back pay. The jury also awarded Mercieca $1,000,000 in compensatory damages for past mental anguish and $9,999,999.24 in exemplary damages. The trial court later conducted a two-day bench trial on attorney's fees.

The trial court signed a final judgment on October 2, 2014, awarding Mercieca $623,065 in back pay; $77,840.20 in prejudgment interest on back pay; $300,000 in compensatory and exemplary damages pursuant to the damages cap in Texas Labor Code section 21.2585; $769,505.98 in attorney's fees "through rendition of judgment, calculated using the lodestar method;" $192,376.50 as "an upward adjustment to the lodestar by a multiplier of 1.25;" conditional appellate attorney's fees; expert fees; and costs. Microsoft filed motions for new trial and judgment notwithstanding the verdict, which the trial court denied. Microsoft filed a timely appeal, and Mercieca filed a timely cross-appeal.

Analyzing the parties' appellate contentions requires consideration of extensive evidence concerning Mercieca's employment history at Microsoft over nearly two decades. This history includes multiple telephone conversations taped by Mercieca, along with saved voicemails and scores of emails. It also includes circumstances that began in October 2009 and culminated in the cessation of Mercieca's employment in March 2012.

A detailed description of the evidence at trial will set the stage for an analysis of Mercieca's contention that he was constructively discharged from Microsoft because he was subjected to working conditions so intolerable that a reasonable person would feel compelled to resign.

FACTUAL BACKGROUND

Mercieca is a middle-aged man of British origin who worked in sales at Microsoft for nearly 18 years. Mercieca started his career at Microsoft in 1994 as a regional distribution sales manager in Melbourne, Australia. He relocated to Dallas, Texas in 1997 and worked as a corporate account executive until 2001.

## I. Mercieca Moves to Microsoft's Austin Office in 2001

Together with his wife and young son, Mercieca moved to Austin, Texas so that Mercieca could work as a senior licensing consultant and a regional licensing specialist on Microsoft's state and local government team.

Mercieca's marriage ended in 2001. Mercieca started dating Lori Aulds that same year; at the time, Aulds also was a Microsoft employee in the Austin office working on a different team. Mercieca and Aulds ended their dating relationship in December 2001. Aulds attempted to reconcile in January 2002 and left Mercieca "love voicemails" that he saved for more than a decade. Although Mercieca and Aulds did not continue dating, they remained friends and "sporadically" had sexual relations until 2005.

Mercieca was promoted to a level 63 position in July 2002 and continued to work on the state and local government team in Austin.[4] He left this sales position in September 2004 and moved to Microsoft's headquarters in Redmond, Washington to join Microsoft's U.S. Original Equipment Manufacturers team as a Group Marketing Manager. This new job was a promotion for Mercieca to a level 64 position. Mercieca did not stay long in Redmond because he soon realized that the job was not a good fit; his son lived in Austin with his ex-wife and he "felt

---

[4] Promotions and level increases provide employees with a base pay increase and place employees on a higher scale for bonuses and stocks; they also afford a greater opportunity to move to a higher position level.

uncomfortable being more inside the office than out with customers.  That's really what [he] love[d] to do."

Mercieca moved back to a sales position in Austin in December 2004 as a Partner Account Manager.  In this role, Mercieca sold Microsoft products to customers (referred to as "partners") to be preloaded on the customers' equipment and computers before they were sold on the market.  This job came with a $20,000 pay cut and a downgrade to a level 63 position.

## II.    Lori Aulds Becomes Mercieca's Manager in 2007

Mercieca's immediate manager left his position in September 2007. Mercieca, who was a Partner Account Manager on the Original Equipment Manufacturers team, considered applying for the vacant manager position.  He changed his mind when he heard that Aulds wanted to apply.  According to Mercieca, he and Aulds had remained friends over the years.  Mercieca claimed Aulds had asked him not to reveal their past relationship.  Mercieca supported Aulds's application to become his manager by giving her a good recommendation and stating he would be "happy to work for Lori Aulds."  Aulds became Mercieca's manager in October 2007.

Mercieca received his fiscal year 2008 performance review from Aulds in September 2008.  Aulds gave him a "70%" ranking and "Achieved" rating.[5]  She gave Mercieca positive feedback and included positive feedback from five peers; Aulds also stated that she wanted Mercieca to develop more consistency, update more partner information on a regular basis, have a more developed career action plan, and take on more strategic projects.

---

[5] At this time, Microsoft used a rating system under which an employee could receive an "Exceeded," "Achieved," or "Underperformed" rating for his performance during a fiscal year.

Mercieca testified that Aulds made her last romantic overture towards him in 2008 while he was sitting in his cubicle at work. Aulds and Mercieca each claimed that the other had an outburst on August 15, 2008, outside of Aulds's office. Mercieca thereafter asked Aulds via email for permission to look for another job at Microsoft. Mercieca testified that he had just finished his first sales quarter in early October 2008 and was on vacation at home in Austin when Aulds called him to question his lack of first quarter performance; he was "stunned" and "upset." Mercieca testified that he felt scared and uncomfortable after this occurrence and he started feeling that his past sexual relationship with Aulds "was going to potentially be a more negative issue than [he] would hope."

### III.    Tracy Rummel Begins Working at Microsoft in 2008

Rummel started working at Microsoft in Houston in November 2008 as a marketing contractor through Xtreme Consulting Group, Inc. Rummel worked for Marc Pisan, who assigned her to the Bass Computers account. Bass is an original equipment manufacturer that sells computers with Microsoft software. Mercieca was the Partner Account Manager for Bass.

Mercieca and Aulds first met Rummel in November 2008 at an annual barbecue Bass hosted for its customers. The Bass barbecue was primarily sponsored by Microsoft. Bass and Microsoft employees met for dinner the night before the barbecue to discuss scheduling and protocol for the event. Mercieca and Rummel worked together after the barbecue, and Mercieca complimented Rummel's work.

Mercieca received his year-end performance review for fiscal year 2009 from Aulds in August 2009. She gave Mercieca a "70%" ranking and an "Achieved" rating. In her performance review comments, Aulds described areas in which Mercieca faced challenges with adapting management and account plan

6

tools into his account management; described the areas in which Mercieca needed to improve; stated that Mercieca failed to achieve his budget goal due to the economy; included one positive partner feedback; included positive feedback from three peers; and included feedback from two peers suggesting areas of improvement for Mercieca.

Rummel and Mercieca met with Bass employees in Houston in October 2009 to talk about the upcoming Bass barbecue. After the meeting, Rummel and Mercieca had dinner and worked through a Microsoft demonstration. Rummel invited Mercieca to her apartment. Rummel's boyfriend was supposed to be present too but was delayed; only Rummel's roommate was at the apartment with them. Mercieca and Rummel played music for about an hour before Mercieca left.

Around that time, Mercieca had career discussions with Aulds and David Tannenbaum, who was Aulds's manager and Director of the U.S. Original Equipment Manufacturers field sales team. Tannenbaum told Mercieca that, in order to be considered for a grade level promotion, Mercieca should take on more responsibility or a particular project to increase his visibility.

Aulds and Tannenbaum suggested to Mercieca that he could take the lead on the Unlicensed Personal Computer project because of his experience working as a licensing specialist. According to Tannenbaum, Mercieca wanted to take the lead and Tannenbaum and Aulds recommended him to Eddie O'Brien, who was the Vice President of the U.S. Original Equipment Manufacturers team. O'Brien agreed and sent out an email on November 4, 2009, announcing Mercieca's appointment as project leader.

## IV. The November 2009 Dinner

On November 5, 2009, several Microsoft and Bass employees attended the

7

traditional dinner held the day before the Bass barbecue; attendees included Mercieca, Rummel, and Bass's general manager Jason Von Cordsen. According to Rummel, Mercieca made her uncomfortable with statements at dinner implying that Mercieca and Rummel were dating. Rummel traveled to Austin after the dinner and stayed at Aulds's townhouse while Aulds was out of town.

When Aulds returned home on Sunday, November 8, 2009, Rummel told Aulds that she felt uncomfortable at the Bass dinner because Mercieca had described his time at Rummel's apartment as a date in front of Rummel's manager and other Microsoft and Bass employees. Aulds advised Rummel to talk to her manager.

Rummel called her manager Marc Pisan the next day to tell him her concerns regarding Mercieca. Pisan responded, "We have a zero tolerance policy for that." He advised Rummel to talk to Human Resources. Rummel also called Mercieca that day in an effort to "clear the air." Mercieca taped the telephone conversation. During the conversation, Rummel told Mercieca she had been uncomfortable at the dinner but considered it a "done issue" after "clearing the air." Mercieca agreed "that's absolutely a done issue," told Rummel that he appreciated their discussion, apologized for making her uncomfortable, and stated that he will "err on the side of just being purely professional." Although Rummel stated several times that this was a "done issue," Mercieca repeatedly told Rummel that he intended to "circle around with everybody" who attended the Bass dinner.

After the telephone conversation with Mercieca, Rummel called Pisan again because she believed Mercieca was overreacting, was manipulative, and wanted to start an investigation. Shortly thereafter, Pisan removed Rummel from the Bass account and other accounts because he wanted Rummel to be comfortable and productive. Pisan told Aulds and Tannenbaum that he had moved Rummel to

8

different accounts.

After talking to Rummel, Aulds told Tannenbaum and O'Brien about Rummel's concerns regarding Mercieca. Aulds then contacted Micky Shields from Human Resources and told her about Rummel's concerns. Aulds and Tannenbaum met with Shields in December 2009 to discuss the concerns Rummel had raised with Aulds, and Shields advised that Rummel should contact her employer because Rummel was not a Microsoft employee. Shields called Rummel's employer, who told her Rummel did not want to pursue further action.

## V.  Mercieca's 2010 Email to Tannenbaum

In mid-January 2010, Tannenbaum informed Mercieca that he needed an outline of Mercieca's plan and strategy for the Unlicensed Personal Computer project by the end of the month. Mercieca responded that the plan and strategy were underway. Tannenbaum sent Mercieca an email in the late morning on February 1, 2010, inquiring about "what to expect" regarding a plan from Mercieca.

Around noon, Mercieca sent his plan for the Unlicensed Personal Computer project to Aulds and Tannenbaum and stated, "3 hours and 14 minutes later than committed to [Aulds] two weeks ago – mea culpa. The documented plan for UPC. I would welcome your insight and any suggestions you may have." Mercieca also responded to Tannenbaum's email in the late afternoon with a confrontational email. Mercieca stated that O'Brien did not ask for a plan but instead Tannenbaum had asked for a plan and he considered "drawing up a plan as an example of internal homework;" criticized Tannenbaum for not getting back to him regarding some unrelated issues and correspondence; stated, "[w]hat concerns me Dave is I hear a lot about what doesn't get done and not a lot about what does;" and acknowledged that this project is a "significant opportunity" but claimed that he

9

"stepped up to do this for" Tannenbaum and Aulds. Mercieca closed his email by stating: "Let me know if this is not adequate for you and maybe we can assign new leadership and I am happy to help that person do a better job. I don't anticipate a response unless it is one to remind me of something else I may not have done."

Tannenbaum considered Mercieca's communication to be disrespectful so he arranged a conference call with Mercieca and Aulds to discuss the email on February 2, 2010. Mercieca taped the call unbeknownst to Aulds and Tannenbaum.

During the call, Tannenbaum stated that he wanted to have a good conversation with him and Aulds because he did not think Mercieca's response to his email was appropriate. Tannenbaum also reminded Mercieca of the discussions they had in November 2009 about the project and his expectations. Tannenbaum stated that he wanted Mercieca to take on the project for himself and not for Tannenbaum or Aulds but that if Mercieca did not want to lead the project to simply have a conversation with Tannenbaum. Tannenbaum also complimented Mercieca on the plan Mercieca had sent.

Mercieca responded, "My first reaction is, yes, not the most shining email . . . I'm sorry about that." Mercieca apologized four times during the conversation for the email he sent to Tannenbaum and stated that he was "out of line." Tannenbaum accepted the apologies. Mercieca also reiterated his commitment to the Unlicensed Personal Computer project. Tannenbaum encouraged Mercieca to take any "feedback for what it's worth" because "none of us are, you know, master's degrees in psychology, and can, you know, dive inside your mind." The call ended on a positive and collegial note.

Mercieca testified that his workplace did not feel the same as 2010 began

10

based on his "sense that things that [he] had been doing for years, with now getting questioned every little thing [he] did, was just wrong. It's like [he] couldn't do anything right. Everything was getting scrutinized, and [he] just felt some increasing pressure." Mercieca testified that the February 2, 2010 call with Tannenbaum and Aulds was "really a surprise" and it "just seemed totally out of left field."

Mercieca also testified that he was surprised when Aulds sent him an email on February 11, 2010, about job opportunities that would be a level promotion. In the email, Aulds stated: "Here's the job description we discussed, I think Ann-Marie is trying to move quickly so you should at least have a one:one to discuss. You'd be awesome in this! She has all the countries listed below because she's open to positioning anywhere within EMEA. Go do it then you can hire me." Mercieca testified he did not want the jobs because they were in Europe and he was happy in his job in Austin; he also stated that he and Aulds never discussed the job positions but that Aulds merely mentioned the job openings in passing.

## VI. Microsoft Hires Rummel Directly in 2010

Microsoft hired Rummel as a full-time employee on February 15, 2010. Mercieca heard that Rummel had been hired and asked Aulds for a meeting. Mercieca met with Aulds on February 22, 2010. Mercieca said he requested a meeting with Aulds because he felt discomfort, was "getting bad vibes, just generally," and felt management was treating him differently. Mercieca testified that Aulds said she knew about his phone conversation with Rummel in November 2009. Mercieca also said Aulds "alluded to the fact that maybe the management were treating [him] differently based on her escalation of whatever transpired in her discussion with . . . Rummel."

Mercieca initially denied that he asked Aulds for the February 22, 2010

11

meeting to complain about Rummel being a bad hire for Microsoft. After Mercieca was presented with his deposition testimony and affidavit, he admitted that the purpose of the meeting with Aulds was to express his concerns about Rummel working in the same division with him and his opinion that Rummel was a bad hire because there had been complaints about her by partners. Mercieca also acknowledged that he first brought up his November 2009 telephone conversation with Rummel to Aulds, who told him she had been aware of the conversation. Aulds said he could contact Human Resources about any concerns, but Mercieca claimed that Aulds also told him she did not want him to contact Human Resources "because it was going to defocus us from our business." Mercieca testified that he was upset and felt betrayed that Aulds and the management team had not spoken to him about the concerns Rummel had raised in November 2009.

## VII. Mercieca Lodges a Complaint in April 2010

Mercieca contacted Human Resources manager Shields via email on February 23, 2010, telling Shields he intended to "lodge a formal complaint around certain events that transpired in November 2009 concerning Tracy Rummel, who was a contractor at that time and recently became an FTE. . . . I would like to understand the process; documentation and options around lodging a complaint." Shields advised him that she would be in meetings all week but would be available on March 1, 2010, and would like to talk to Mercieca to "walk through the process as well as hear [his] concerns."

Between March 1 and March 26, 2010, Mercieca had several lengthy conference calls with Shields and Dan Shea, an investigator for Microsoft's Employee Relations Investigation Team (the "Investigation Team"). The calls addressed filing a complaint against his management team; the complaint process; what types of complaints would trigger an Investigation Team inquiry; and what

types of complaints would be handled by Human Resources. Shea explained that Investigation Team inquiries are triggered by discrimination or sexual harassment complaints.

In the meantime, Mercieca received his midyear checkpoint performance review on March 8, 2010. The review contained several positive and complimentary comments Aulds made regarding Mercieca's work. Mercieca testified that the performance review Aulds gave him was "really good."

Aulds told Mercieca that he would not be attending an upcoming March 11, 2010 conference; he usually attended this conference because two of his larger partners also attended. Mercieca testified that he was contacted by some of his partners who attended the conference because there were logistical issues and they were "unhappy" he was not there. Mercieca testified that he called Aulds who was at the conference to tell her that some partners are "not too happy. Just make sure you kind of take care of them, give them a little extra TLC, tender loving care." According to Mercieca, Aulds snapped at him.

Mercieca sent an email to Shields and Shea on March 26, 2010, thanking them for the time they spent discussing "the sequence of events over the past few months." He told them: "I have evaluated our discussions and whilst I understand the policies that exist to protect me in such circumstances, I still find myself in a position of discomfort at best and fear at worst. In light of the current atmosphere that I find myself working in and after the utmost consideration, I feel that my only option to resolve this situation is to lodge a formal complaint and request a full review and investigation of the circumstances." Shields continued to communicate with Mercieca into April about the complaint procedure.

In the meantime, Rummel contacted Shields in March and asked for an appointment to talk to Shields on March 29, 2010. Although Rummel testified that

13

she had first spoken about her concerns regarding Mercieca to Shields in late November 2009, Shields did not recall any contact with Rummel before March 2010. Rummel missed the March 29, 2010 appointment with Shields and asked to reschedule it.

On April 7, 2010, Aulds sent an email to the Partner Account Managers she was supervising, including Mercieca, asking for feedback to help prepare one of her colleagues for an upcoming meeting. Mercieca responded that "Partners see reduction in T[ravel]&E[xpenses] as a reduction in investment in them."

On April 13, 2010, Bass's general manager Jason Von Cordsen sent an email to Aulds, Tannenbaum, and O'Brien praising Mercieca's work as Bass's Partner Account Manager. Von Cordsen also stated that Mercieca "used to be able to spend the whole day at least once a month [at Bass] but within the last year that has been tapered back (I'm sure because of travel and expense cuts) and it has affected our numbers with Microsoft." Aulds did not forward Von Cordsen's positive email to Mercieca, but Mercieca received the email because Von Cordsen blind cc'd Mercieca on his email.

A day later, Aulds responded to Mercieca's April 7, 2010 email thanking him for his updates and noting her concern about his statements regarding the travel and expense budget. Aulds said that his statements indicated he had been discussing travel and expense budget issues with his partners. She stated, "I believe this is an inappropriate conversation to have with partners and caution you to be careful in your messaging." She said that she had given Mercieca the opportunity to request additional money for travel and expenses and, if the budget was affecting his ability to manage his account, to talk about the budget again.

Mercieca responded to Aulds the same day, stating, "I believe your e-mail sent me a message that give[s] me concern a) a caution or warning b) that you may

14

have a concern as to my judgment on utilization of expenses c) possible infraction of confidential information." Mercieca made numerous points in his two-page email, including that partners know "how tightly we manage operational expenses," that he has never provided confidential information regarding travel and expenses to any partners, and that Tannenbaum had already told Von Cordsen during a visit at Bass that "we are managing our [Travel and Expenses] tightly and Eddie is watching closely."

Aulds sent Mercieca the following email response in the evening: "Michael — I simply tried to provide feedback on an issue that I felt needed to discuss. Since you had to cancel our one:one[6] this week I felt my best option was to email you rather than let this sit for weeks. I have rescheduled our one:one for next week. Let's please discuss then the manner in which I can provide feedback to you so that you are receptive and we can have a dialogue. Thank you!"

Mercieca called Aulds on April 15, 2010, and engaged her in a lengthy telephone conversation, which he taped unbeknownst to Aulds. Mercieca and Aulds talked about their latest email exchange regarding travel and expenses. After Mercieca inquired several times if Aulds had a problem with his work performance, Aulds replied that his response and lack of respect posed a problem and that their difficulties working together had to be addressed. When Mercieca questioned Aulds about how the situation should be addressed, Aulds replied, "I don't know, Michael. You know, we both have other options. . . . Look for another job. I don't know." Mercieca then questioned Aulds, "So you're telling me that I should look for another job?" Aulds replied that "it's just very clear that you're unhappy working for me." When Mercieca pressed Aulds on whether she was

_____

[6] A "one:one" is a discussion a Partner Account Manager has on a regular basis with his manager regarding work-related matters.

15

asking him to look for another job, she responded, "No. You are unhappy working for me. There's a lack of respect." Mercieca again asked whether she was telling him he needed to look for another job, and she responded, "I'm not saying that. I am uncomfortable working with you. . . . However you want to infer something, you infer that, Michael. . . . But I'm just saying this is an uncomfortable work situation."

Mercieca filed a formal complaint against Aulds, Tannenbaum, and O'Brien on April 19, 2010. In the complaint, Mercieca stated:

> This complaint is based on situations, discussions and experiences which have occurred over the past 5 months following an event at one of my partners, Bass Computers, on November 5th/6th 2009 and the most recent occurrence April 14th/15th with my manager, which I see as the tipping point.
>
> A string of events began following an informal discussion I understand took place between Tracy Rummel and my direct manager Lori Aulds, whilst they spent weekend together as friends following the above mentioned event.
>
>      . . . .
>
> I believe that over the past 5 months, I have become a victim of a malicious baseless rumor which has assassinated my character and marginalized my role on the US Local OEM Team.
>
> My reputation within the management structure has been tainted and as a result there have been many instances, for which I have evidence, that certain aspects of Microsoft Standards of Business Conduct; Company Guidelines and Policies; and Microsoft Corporate Values have been breached and compromised including but not limited to:
>
> 1. A lack of common sense and good judgment
>
> 2. Lack of integrity & dishonesty
>
> 3. Misleading; misrepresentative and derogatory comments
>
> 4. Conflicts of interest
>
> 5. Increasing negativity towards me constituting harassment

. . . .

> . . . part of my objective in lodging this complaint, is to seek the truth and create an environment of transparency.
>
> I am confident that the result will be a complete exoneration of fault on my part. I also hope that this mistreatment; negativity and harassment will stop and my former stellar reputation, which has been impugned, will be restored.

Mercieca acknowledged at trial that his complaint contains no allegations about discrimination or sexual harassment.

Mercieca had several conversations with Shields and Shea between April and June 2010. Shea informed Mercieca within one week of filing that his formal complaint did not fall within the scope of an Investigation Team inquiry because it did not address allegations of discrimination or sexual harassment. Mercieca and Shea exchanged several more emails thereafter because Mercieca expressed concern that his complaint was being "summarily dismissed." Shea assured Mercieca that his complaint was not being summarily dismissed and that the concerns raised in his complaint would be addressed by Shields; he stated that Shields and "her group within HR are best equipped with the resources to address them and that is why they will be following up with you."

Mercieca continued to communicate with Shields. He raised concerns regarding one:one communications with Aulds, which Shields addressed in a telephone conversation on April 26, 2010. Shields sent an email to Mercieca and Aulds the next day addressing Mercieca's concerns regarding communication with Aulds. Shields also started to investigate Mercieca's complaint and talked to Mercieca's management.

On May 3, 2010, O'Brien sent an email to all United States Original Equipment Manufacturers division personnel that two females had been promoted to the position of director within the division. One of the females was Aulds.

Mercieca testified that he was offended by O'Brien's email as being discriminatory and complained to General Manager of Global Diversity and Inclusion Gwen Huston. O'Brien was not reprimanded for sending the email.

On that same day, Mercieca's attorney Roy Pollack sent Shields a letter requesting that all further communications regarding Mercieca's formal complaint be addressed to him. Pollack also said he was "confident that your company will conduct a thorough investigation that will wholly exonerate Mr. Mercieca of any rumors, innuendos, or other questionable accusations that are floating around."

## VIII. Rummel Lodges a Complaint Against Mercieca in May 2010

On May 7, 2010, after missing her March appointment with Shields, Rummel talked to Shields about filing a formal complaint against Mercieca. Shields filled out an Employee Relations Investigations Intake Form on May 10, 2010, describing Rummel's allegations against Mercieca in terms of sexual harassment and retaliation.[7] Shea interviewed Rummel regarding her complaint on May 17, 2010, because it fell within the scope of an Investigation Team inquiry. Rummel stated during her interview that Mercieca did not behave inappropriately toward her after November 2009.

Shea contacted Mercieca on May 25, 2010, to inform him that allegations related to Microsoft's anti-discrimination and anti-harassment policy had been raised against him. Shea said he was conducting an Investigation Team inquiry

---

[7] The allegations stated in the complaint were as follows: "Michael Mercieca made advances towards Tracy [Rummel] including asking her to stay at his home when she was in town for business and talking to her about sex. In working together with a partner account, they arranged for a dinner prep meeting with the partner and when Tracy arrived for dinner, the partner was not there, just Michael. Michael made this sound like it was a date. Tracy talked to Michael about this and he apologized. Within days of the dinner, the partner told Tracy that she was not adding any value and didn't want to have her participating on the account. Tracy is [sic] continues to be concerned that Michael's relationship with the partner and her asking him to stop making advances is now impacting her work relationship with the partner."

18

and would like to speak to him. Mercieca testified that he was "given a full opportunity to respond to these allegations" during the June 17, 2010 interview with Shea.

Meanwhile, Aulds attended the Microsoft partner advisory council meeting in Bellevue, Washington on June 9, 2010. Bass's general manager Von Cordsen was a council member and also attended. Von Cordsen testified that Aulds asked him during the meeting "how was Michael doing on my account as she -- as she always did. She was the manager. We discussed -- we discussed that the account is going great." Aulds then asked Von Cordsen about Mercieca's state of mind; told him that Mercieca seemed paranoid; and asked him if he would talk to Human Resources about Mercieca's state of mind. Von Cordsen testified that Aulds "sounded like she was genuinely concerned about Michael's state of paranoia, that -- that Michael -- Michael was just overdocumenting things and -- asking questions of other people . . . to where it just seemed to her that he was extremely paranoid and -- and something was going on."

Von Cordsen did not express any concerns regarding Mercieca's mental state to Aulds. Von Cordsen called Mercieca later in the evening to tell Mercieca that Aulds asked him to talk to Human Resources. He also told Mercieca he "genuinely thought" Aulds was concerned for Mercieca, and that Mercieca might be jeopardizing his job because Aulds thought Mercieca was acting paranoid. Mercieca later told Von Cordsen that he had filed a complaint against Aulds and others at Microsoft.

## IX. Mercieca Files an Amended Complaint in June 2010

Mercieca's attorney sent an amended formal complaint on June 9, 2010, to Shields, Shea, and the Microsoft Investigation Team. In the complaint, Mercieca stated for the first time he was "formally complaining about Microsoft's harassing,

19

discriminatory, and retaliatory conduct based on his gender and national origin, which has surfaced since approximately November, 2009." Mercieca's complaint further stated in pertinent part:

> Mr. Mercieca is formally complaining about sexual harassment in the workplace.
>
> Moreover, Mr. Mercieca is formally complaining about the conflict of interest that exists between Lori Aulds, his direct manager, and Tracy Rummel's [sic], a former contractor and newly hired employee, who is a close friend of Ms. Aulds.
>
> Mr. Mercieca is formally complaining about the patent breach of confidentiality, in addition to the breach of personnel information that has occurred between, among others, Lori Aulds and Tracy Rummel, prior to Ms. Rummel's hiring by Microsoft.
>
> Mr. Mercieca is formally complaining about Microsoft's steady course of retaliation pertaining to various aspects of his employment with Microsoft.
>
> Mr. Mercieca is also complaining about the hostile work environment that has surrounded him since the undisclosed allegations pertaining to him started to covertly spread throughout the infrastructure of Microsoft.

Shea informed Mercieca on June 15, 2010, that the Investigation Team had received his amended formal complaint and another investigator would follow up with Mercieca to schedule a time to discuss his complaint. Shea also informed Mercieca that he would continue to be the investigator for Rummel's complaint. Mercieca requested that Shea handle both Rummel's complaint and Mercieca's complaint.

In mid-June 2010, Mercieca announced that he was taking a four-week vacation during July and August. According to Mercieca, this announcement prompted "pushback" from Microsoft; he had not previously encountered resistance to a vacation request. Mercieca testified that he was upset and did not know why he received pushback when July through August was known as the

quietest time. In one of Tannenbaum's emails to Aulds discussing Mercieca's requested vacation, Tannenbaum stated, "I still have a problem with this . . . we need to make sure that before he leaves he fully understands ALL deliverables that must be made on time. I will not accept not being 100% green because of him." Aulds also asked Shields if there was any "legal recourse to deny" Mercieca's requested vacation time because "[w]e are concerned about deadlines in Q1 that need to be met."

## X. Mercieca Begins Working From Home and Discloses His Relationship With Aulds in August 2010

Aulds informed Mercieca in early August 2010 that he would not be participating in a meeting scheduled with one of his partners, Motion Computing. Besides Motion Computing's CEO David Altounian, only Microsoft director-level employees were included in the meeting. Mercieca confronted Aulds at the office to express his disagreement about not being included in the Motion Computing meeting; he taped the conversation unbeknownst to Aulds.

During the conversation, he expressed that he was sorry about not being included in the meeting and then proceeded to question Aulds about why he was not being included and whether he had been specifically excluded. Mercieca stated several times that he was perplexed and did not understand why he as a Partner Account Manager would not be included. He also questioned Aulds about her opinion on whether he should have been included and whether she spoke up on his behalf as his manager. Aulds explained to Mercieca that superiors wanted to include just a few people and have a small group, and "that there's a lot of stuff happening really fast right now."

After expressing his disagreement several times about not being included in the meeting, Mercieca ended the conversation stating: "I think it's the wrong

decision. And you know what, it'll survive without me. I'm not that indispensable. But I think it's the wrong message. And I think you send the wrong message when an account manager -- anybody who knows anything about an account manager would not make this decision. I'll repeat myself. Anybody who knows anything about an account manager would not make this decision. It's a bad one. Okay."

Aulds sent Mercieca an email on August 2, 2010, telling him that his "outburst" outside her office was inappropriate and disruptive; that his "raised voice was overheard by several in the office & demonstrated a lack of respect which goes directly against our company value of openness & respect;" and that "[s]haring [his] displeasure of a decision with the entire office was not appropriate." Mercieca responded to Aulds with a lengthy email recalling his version of their conversation and explaining his perception.

Mercieca denied any outburst; testified that his behavior was not inappropriate; and said that Aulds's email constituted retaliation against him. Mercieca testified that, after Aulds's email, it was "clear to me that, just a bunch of negative, covert things were going on, and I was concerned that people could be -- you know, could make some things up. . . . And so my worst fears were realized. And I made the decision, I couldn't go around doing my job and taping every conversation that I had. Worried every minute of every day that somebody is going to make something up, and then I'd have to catalog it and listen to it. I couldn't do it. So I just stopped going to the office and I started working out of my home, which I hated."

Mercieca testified that he had to start seeing his therapist and taking antidepressants to alleviate the stress he was experiencing because of his work situation. He testified that until he stopped going to the office in August 2010, he

22

could not sleep, experienced weight fluctuations, was anxious, and triple-checked everything.  He testified that his work situation after November 2009 put a strain on him and his family and caused him to become depressed, angry, nervous, anxious, removed from people, paranoid, and physically ill with nausea and knots in his stomach.

On August 11, 2010, Mercieca and his attorney met with Dan Shea to discuss Mercieca's concerns.  Because Mercieca had not named any specific Microsoft employees in his June 9, 2010 complaint, Shea did not know until the interview that Mercieca's complaint was against Aulds, Tannenbaum, and O'Brien.

Mercieca also told Shea for the first time that he had a past sexual relationship with Aulds.  After Aulds denied the past relationship, Mercieca provided Shea with proof in the form of photographs, notes, and voice messages Mercieca had saved since 2001-02.  Aulds admitted to the past sexual relationship only after Shea confronted her with this evidence.  After Shea confirmed that Mercieca and Aulds had a past sexual relationship, Shea recommended removing Aulds as Mercieca's direct manager.  Shea continued his investigation and interviewed eight Microsoft employees.

Mercieca testified that Shea confirmed that a criminal background check of him had been conducted during the investigation after Aulds claimed she was afraid of him.  Mercieca testified that to his knowledge no background check of Aulds had been conducted after Mercieca raised safety concerns.

## XI.  Mercieca Receives his Fiscal Year 2010 Review in September 2010

Mercieca received his performance review for fiscal year 2010 from Aulds on September 8, 2010.  She gave him the same "Achieved" rating and "70%"

ranking that she had given him in 2008 and 2009. In the review's employee comment sections, Mercieca outlined his accomplishments for the year and noted areas for improvement. He quoted several positive emails from his partners and quoted positive feedback from one of his peers. Mercieca noted that an Investigation Team inquiry was being conducted after he filed a formal complaint. He also noted, "I feel there has been increasing hostility from my management team coupled with a lack of support. . . . I also feel that despite my sterling performance . . . I will receive a negative review this time around. Much of the positive feedback from Partners I seem not to receive from management."

In the review's manager comment sections, Aulds noted that "Microsoft takes the concerns that [Mercieca] raised seriously, is addressing those concerns, and will take appropriate action." She also noted that:

- Mercieca's partner poll participation was 33% and missed the target 50% partly because Mercieca failed to update contacts and failed to follow the process established for the team;

- Mercieca needed to improve documenting information;

- Mercieca had a sufficient travel and expense budget so that he should have been able to spend enough time with his partners so they would not feel the need to raise travel and expense concerns;

- Mercieca missed the deadline and failed to provide ongoing leadership on the Unlicensed Personal Computer project;

- Mercieca received positive feedback from some of his peers and partners, and Aulds quoted some of the negative feedback Mercieca received from his peers; and

- Mercieca met his overall business commitments and outlined areas he did

"great work" in.

On September 14, 2010, Tannenbaum sent Shea an email expressing his concern that a final decision regarding Mercieca's complaint was being prolonged by newly raised claims; Tannenbaum stated: "After speaking with Lori this morning[,] I am getting concerned that Michael is continuing to raise new claims which is prolonging the final decision. If this is the case, can we state to him and his lawyer that they have until xx day (I would suggest 48 hours) to raise all claims in this process as we plan to make [a] final decision by this coming Monday." Shea responded that he understood Tannenbaum's concerns but explained that Microsoft has an open-door policy for employees to raise concerns and Microsoft takes Mercieca's concerns very seriously. Shea also stated, "I understand the desire of all parties to finalize the investigation and I am working diligently to that end."

## XII. The Investigation Results Are Reported in October 2010

Shea completed his investigation of Mercieca's and Rummel's complaints in October 2010. He sent a memorandum to Mercieca on October 4, 2010, informing him the evidence did not support his allegations that (1) Aulds, Tannenbaum, and O'Brien treated him unfairly because of his gender or national origin; (2) Aulds, Tannenbaum, and O'Brien retaliated against him for raising his allegations of unfair treatment to Human Resources; and (3) Aulds engaged in unwelcome behavior that was sexual in nature or directed at him because of his gender. Shea sent a memorandum to Rummel on October 7, 2010, informing her the evidence did not support her allegations that Mercieca (1) engaged in unwelcome behavior that was sexual in nature or directed at her because of her gender; and (2) retaliated against her after she reported the unwelcome behavior.

Shea also informed Mercieca's management team about the outcome of his investigation. With regard to Mercieca's complaint, Shea testified that, after

25

considering the demeanor of the parties involved, finding no evidence corroborating any retaliation, harassment, or discrimination, and finding credibility issues with Mercieca, Shea concluded that there was no wrongdoing by Mercieca's management team. Shea testified that credibility concerns regarding Mercieca arose because Shea "felt that there were some instances where he didn't tell me the truth, or admitted to a lie that he had prepared. I saw some exaggerations. I saw some misinterpretation of people's intentions on his part."

After the investigation, a "Warning Letter" was drafted and placed in Aulds's personnel file by her manager Tannenbaum. The letter stated that Aulds had "demonstrated inappropriate behavior or poor judgment. Specifically during the ERIT investigation conducted over the last 6 weeks, you did not initially provide truthful information about a prior romantic relationship. . . . Further, you should have disclosed the prior romantic relationship and the close personal relationship to Human Resources or management at the time that you were hired for your current position and during the time that HR was looking into concerns raised by one of your directs in March 2010. . . . This memo will serve as a written reminder that further such actions may lead to further corrective action, up to and including termination."

## XIII. Mercieca Begins Working For a New Manager in December 2010

Peter Han joined the Original Equipment Manufacturers sales team as director and manager on October 4, 2010, becoming Aulds's and Tannenbaum's supervisor. In his new role, Han visited with the different Microsoft partners and their Partner Account Managers, including Mercieca, to understand how to better manage the sales team's business. Mercieca was very complimentary of Han. Mercieca indicated to Han in November 2010 that there had been "tension and problems" between him and Aulds. Han asked Mercieca to "re-engage" with

Aulds. Han recognized that there was a communication issue and thus a need for change in the reporting line between Mercieca and Aulds. A search for a new manager to replace Aulds began. Han hired Joe Sahagian as Mercieca's direct manager in December 2010. Aulds was moved out of Mercieca's management team.

In preparation for the upcoming midyear checkpoint performance review, Sahagian and Tannenbaum submitted a rating for Mercieca as a "'low' Achieved/70" to Han in the beginning of February 2011. However, Han sent an email to Sahagian and Tannenbaum explaining that he had placed Mercieca in the "Underperformed/10 category" because of Mercieca's lack of contribution to strategic dialogues; silence or lack of participation in team meetings; communications breakdowns around vacation time taken in December 2010; low performance in sales in two out of three Microsoft product groups; and low partner survey participation.

Mercieca received his midyear checkpoint performance review from Sahagian on March 11, 2011. The review considered six different areas in evaluating employees. Out of the six areas, Mercieca agreed with his manager Sahagian that he needed to improve in five of the six pertinent areas. In the review's manager comment section, Sahagian noted that Mercieca "has showed some positive results in H1 . . . . The areas where [Mercieca] is not meeting commitment expectations and were he needs to focus on in H2 is meeting revenue targets across all Product Groups, deeper CRM focus, and embedded scorecard metrics; he needs to show immediate and sustained improvements in these areas. We will address these areas via weekly 1:1s for the remainder of the fiscal year. I would like [Mercieca] to drive those meetings and set the agenda. I will provide him with my feedback on his performance following the meetings."

Sahagian testified that he worked with Mercieca during fiscal year 2011 to help him improve in his role as Partner Account Manager; Mercieca especially had to improve his low participation rate on partner surveys and improve his revenue attainments in two of three product groups in which he fell short. To help Mercieca, Sahagian implemented weekly meetings with Mercieca to review his progress. Sahagian told Mercieca: "After each meeting, I will send you an email summary of our meeting to make sure you understand my expectations and the feedback on your performance. Michael, your work is important to the success of our team, and I support you in your efforts to get your performance back on track. Please understand that you need to make immediate, significant and sustained improvement in these areas."

Han also testified that he continued to work with Mercieca on his performance and tried "to help foster the kind of environment in which [Mercieca] would be able to continue his career at Microsoft" through managing, coaching, and "talking to how we get through different situations."

Mercieca sued Rummel on April 6, 2011. Mercieca continued to enjoy working with Sahagian. Nonetheless, he expressed that his work situation continued to be stressful, and that he felt like he was being pushed out of his job.

## XIV. Mercieca Receives his Fiscal Year 2011 Review in September 2011

Mercieca received his performance review for fiscal year 2011 in September 2011. Microsoft implemented a new rating system during 2011, transitioning from an "Exceeded, Achieved, Underperformed" rating to a 1 to 5 rating system. Mercieca received a 5 rating on his 2011 performance review, which is the lowest possible rating. Receiving a 5 rating meant that Mercieca's performance was unacceptable; improvements needed to be seen; Mercieca could not transfer to a different team or division without O'Brien's approval; and although Mercieca's

28

base compensation stayed the same, he could not receive a merit increase on his base salary, stock bonus, or commitment bonus.

In the performance review's employee comment sections, Mercieca

- stated Sahagian and Han "have been very transparent and supportive in cementing my position with my partners;"

- outlined his accomplishments for the year and noted that he did not meet his numbers in two product groups;

- did not include or quote positive feedback from partners or peers as he had done in previous performance reviews;

- opined on his co-workers' performance and that some had not met their numbers or quota;

- complained about being "placed on a weekly performance review with my manager, which is an indication that I am being given unwarranted extra scrutiny which I see as continued harassment and unwarranted focus based on my past and current formal complaints and following legal actions;"

- thanked Sahagian for his support and stated that, despite the negativity, harassment, and untenable work environment, Mercieca put Microsoft and his partners first and continued to "drive attainment in line and often in excess of commitment levels."

In the review's manager comment sections, Sahagian

- outlined the areas in which Mercieca improved, performed well, and achieved his commitments;

- noted that Mercieca did not achieve his commitment for partner poll

29

participation at only 36% which was the lowest on the team and demonstrated a lack of effort;

- noted that Mercieca failed to meet his numbers in two of the three product groups and, "[i]n doing so, [Mercieca] was one of only a few people who missed two product groups in FY11;"

- stated that, despite some areas of success, there were a number of areas in which Mercieca did not achieve his commitments and that Sahagian "expect[ed] to see consistent and sustained improvement," including improving product and technology expertise;

- noted that Mercieca needed to improve on cross group collaboration, stating that "[o]ver the past year you have not been able to generate support from others. Feedback -- both verbal and from the feedback tool -- indicates that others are having trouble partnering with you. You have engaged with others in a way that makes the[m] not want to partner with you. How you perform your job is just as critical as your end results. Your inability to partner with your team is not good for our internal team dynamics, external team dynamics and customers;"

- criticized Mercieca for including in his overall self-assessment "speculation and hypothesis about other employees," which is "not appropriate" content for his annual review as he should focus on his performance and not that of other employees; and

- stated, "You also suggest that the performance coaching we have worked on over the last year is retaliatory in some way. I can assure you that I take the development of employees very seriously, and that I initiated this action as a way to help you improve both the 'what'

and 'how' of your performance.  Any coaching and management I have provided you was a result of legitimate business and performance concerns."

Sahagian traveled to Austin to personally deliver Mercieca's performance review. He told Mercieca that he would work with him to avoid another 5 rating. According to Mercieca, Sahagian stated during the meeting that "this would be the last review like this that he would do. . . .  He said that's because either you or I won't be here next year."  Mercieca also testified that he asked Sahagian if there was anything he could do to save his position.  Mercieca testified, "I was left with the feeling that I couldn't."

Sahagian denied telling Mercieca that "this is the last review like this [he]'ll be giving."  Sahagian testified that he "probably said something about being disappointed in giving this review;" he also acknowledged not being happy delivering the review because he did not "like delivering 5s messages."  Sahagian also testified that he did not believe Mercieca deserved a 5 rating, but he denied giving him a 3 rating.  He testified that he placed Mercieca in the third place out of the five employees he supervised but that did not mean he gave Mercieca a 3 rating.  Sahagian testified that he only provided feedback for the five employees he supervised and that under Microsoft's calibration process in evaluating and rating employees all of the employees he supervised could end up with a 5 rating.

After receiving the performance review, Mercieca sent a "rebuttal letter" via email to Sahagian on September 8, 2011.  Mercieca expressed his disagreement with the review but thanked Sahagian for the way he "handled this review" and for the support since becoming his manager.

## XV.  Mercieca Sues Microsoft in September 2011 and Resigns in March 2012

Mercieca sued Microsoft on September 15, 2011; thereafter, he continued to work at Microsoft for about six months. Mercieca also continued to work with Sahagian on improving his performance for fiscal year 2012, including improving his numbers across all three product groups. Mercieca and Sahagian had many discussions regarding how to improve in areas of concern. Some time in January 2012, one of Mercieca's partners, Xplore Technologies, asked to have a new Partner Account Manager assigned because it did not want to work with Mercieca any longer, but Sahagian supported Mercieca and he remained on the account.

Mercieca testified that in the beginning of 2012 his doctor increased the dose on his antidepressants because his work situation was extremely stressful. On February 22, 2012, Mercieca's attorney sent a letter to Microsoft's attorney informing him that Mercieca had endured Microsoft's hostile environment for too long, considered himself constructively discharged, and would not be returning to work "effective April 2, 2012."

On March 9, 2012, Sahagian called Mercieca to discuss his midyear checkpoint performance review. The review considered six different areas in evaluating employees. Out of the six areas, Mercieca agreed with Sahagian that he needed to improve in two of the six areas. In the review's manager comment section, Sahagian noted that Mercieca met his numbers in two of the three product groups; Sahagian noted that Xplore Technologies asked to replace Mercieca as its Partner Account Manager with someone who would provide more energy and help it accelerate growth; Sahagian encouraged Mercieca to work on cross group collaboration because he only worked well with a select group of peers; Sahagian concluded that Mercieca "is trending to stack rank low relative to his peers. There are several area's [sic] identified above where [Mercieca] has opportunity to grow, but the two most critical are revenue across [product groups] and how the work is

32

accomplished, namely cross group collaboration."

During the review discussion, Mercieca told Sahagian that he was leaving Microsoft.

In response to the jury's question at trial asking why he left Microsoft when "your job duties did not change, nor was there a change with your accounts, nor a change to your pay, why did you leave Microsoft if Microsoft responded to your complaint about management with providing you with a new manager," Mercieca stated as follows: "It was very clear to me that no matter what I did, I got a level 5 . . . in FY11. And even though my performance was impeccable, my new manager, Joe Sahagian, who I respected immensely, conveyed to me, and in my midyear review, that I was trending towards another 5, and that would have been Microsoft's announcement that I would not have been able to stay. And it just got too much. I just couldn't keep doing the level of work I needed to do with the lack of support above Joe Sahagian that I was getting."

Mercieca sent an email to the Original Equipment Manufacturers team on March 20, 2012, announcing it was his last day at Microsoft.

## ANALYSIS

We begin by addressing Microsoft's contention that no evidence supports the jury's "Yes" answer to Question 7 in the jury charge, which asked if Mercieca was "constructively discharged from Microsoft."

## I.   Standard of Review

When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder

33

could do so, and disregard contrary evidence unless a reasonable fact finder could not do so. *Id*. at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id*. Evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810.

## II.   Constructive Discharge

The following question and instruction were submitted to the jury:

### QUESTION 7

Was Michael Mercieca constructively discharged from Microsoft?

> An employee is considered to have been "constructively discharged" when an employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign.

Answer "Yes" or "No."

> Answer: <u>Yes</u>

The jury also was asked whether Mercieca engaged in a statutorily protected activity:

### QUESTION 10

> Did Michael Mercieca oppose a discriminatory practice, make or file a complaint of discrimination, or assist or participate in an investigation concerning a complaint of discrimination based on a reasonable, good faith belief that the conduct he complained of actually violated anti-discrimination, anti-harassment laws, even if he was ultimately mistaken?

Answer "Yes" or "No."

> Answer: <u>Yes</u>

34

Finally, the jury was asked whether Mercieca was constructively discharged because he engaged in a statutorily protected activity:

If you answered "Yes" to Questions 7 AND 10, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 11

Was Michael Mercieca constructively discharged because he opposed a discriminatory practice, made or filed a complaint of discrimination, or assisted or participated in an investigation concerning a complaint of discrimination?

> Michael Mercieca must establish that without his opposition to a discriminatory practice, making or filing a complaint of discrimination, or assisting or participating in an investigation concerning a complaint of discrimination, if any, Michael Mercieca would not have been constructively discharged when, and if, he was. There may be more than one cause for an employment decision. Michael Mercieca need not establish that his filing a complaint of discrimination or participating in an investigation concerning a complaint of discrimination, if any, was the sole cause of the constructive discharge, if any.

Answer "Yes" or "No."

Answer: <u>Yes</u>

Microsoft argues that this record contains no legally cognizable evidence of constructive discharge, and thus no evidence of an adverse employment action.

Microsoft contends that Mercieca's evidence of intolerable working conditions is "wholly insufficient" to support the jury's finding of constructive discharge because unfavorable performance reviews cannot serve as the basis for a constructive discharge finding. It also contends there is legally insufficient evidence that Mercieca experienced a reduction in salary or job responsibilities or that he was demoted; reassigned to menial or degrading work; subjected to badgering, harassment, or humiliation; offered early retirement; or given an ultimatum to resign or be fired.

35

Questions 7, 10, and 11 submitted a claim based on the Texas Commission on Human Rights Act, which prohibits employers from engaging in retaliatory action against an employee for opposing a discriminatory practice. *See San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015); *see also* Tex. Lab. Code Ann. § 21.055 (Vernon 2015). "Because the [Texas Commission on Human Rights Act] was enacted in part to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments,' we look to relevant federal law for guidance when the relevant provisions of Title VII are analogous." *Nicholas*, 461 S.W.3d at 136-37 (quoting Tex. Lab. Code Ann. § 21.001(1) (Vernon 2015)). To establish a statutory violation, the employee must show that (1) he engaged in an activity protected by the Act, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse action. *Id*. at 137.

Constructive discharge is not a freestanding cause of action; instead, this concept permits an employee who has quit to demonstrate the required "adverse employment action" necessary for a statutory retaliation claim under section 21.055. *See Carlton v. Houston Cmty. Coll.*, No. 01-11-00249-CV, 2012 WL 3628890, at *17 (Tex. App.—Houston [1st Dist.] Aug. 23, 2012, no pet.) (mem. op.); *see also Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 805 (Tex. 2010) ("A constructive discharge qualifies as an adverse personnel action under the TCHRA. . . ."); *Passons v. Univ. of Tex. at Austin*, 969 S.W.2d 560, 562 (Tex. App.—Austin 1998, no pet.) ("Constructive discharge serves as a legal substitute for the discharge element of a prima facie case of discrimination.").

The jury charge's definition of constructive discharge comports with Texas Pattern Jury Charge 107.10 and with caselaw. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (describing the proper inquiry in a constructive discharge

36

analysis); *Williams*, 313 S.W.3d at 805 (same); *Gardner v. Abbott*, 414 S.W.3d 369, 381 (Tex. App.—Austin 2013, no pet.) (same); *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 475 (Tex. App.—Austin 2000, pet. denied) (same); *Passons*, 969 S.W.2d at 562 (same); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Employment* 107.10 (2014).

The key inquiry here does not focus on whether a particular employee felt compelled to resign; instead, it focuses on whether a reasonable employee would have felt compelled to do so. *Gardner*, 414 S.W.3d at 381. The inquiry addresses the conditions imposed — not the employer's state of mind. *Id*.

"Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but a number of factors have been identified as bearing on this inquiry." *Id*. at 383. These include the following: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (6) offers of early retirement that would make the employee worse off whether the offers were accepted or not. *Id*.; *see Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014); *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 575 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

We first address factors (1), (2), (3), (4), and (6). Mercieca was not demoted. He kept all of his accounts and, even when Xplore Technologies asked for a new Partner Account Manager, Mercieca remained on the account. The evidence establishes that Mercieca's base salary remained at its existing level after he received a 5 rating on his 2011 performance review; he could not receive a merit increase, stock bonus, or commitment bonus. There is no evidence that Mercieca received a reduction in job responsibilities; that he was reassigned to

37

menial or degrading work; or that he received offers of early retirement.

Turning to factor (5), Mercieca's brief does not identify specific instances of "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." Mercieca testified generally at trial that he experienced "negativity" and "marginalization" from his management team. In the employee comment section of his 2010 performance review, Mercieca stated that he experienced "negativity" and "marginalization" but identified no specific instances.

Mercieca testified that he decided to file a formal complaint in March 2010 because "[he] had been subjected to a lot of harassment, bullying, and retaliation." Except for one example he provided in his 2011 performance review employee comment section, Mercieca did not elaborate on specific conduct he considered to be harassment and bullying by his management team. Mercieca described the one example as follows: "I was placed on a weekly performance review with my manager, which is an indication that I am being given unwarranted extra scrutiny which I see as continued harassment and unwarranted focus based on my past and current formal complaints and following legal actions." Mercieca also testified that he was excluded from two meetings. This evidence cannot reasonably be construed as evidence of badgering, harassment, or humiliation by an employer that was calculated to encourage an employee to resign from his job. *Cf. Haley v. All. Compressor LLC*, 391 F.3d 644, 650-51 (5th Cir. 2004). Accordingly, out of six factors, there is evidence of only one factor in this case.

Mercieca contends these six factors are not exclusive. *See Waffle House, Inc. v. Williams*, No. 02-05-00373-CV, 2011 WL 3795224, at *16 (Tex. App.— Fort Worth Aug. 25, 2011, pet. denied) (mem. op.) ("[W]e disagree that an employee may not prove constructive discharge without establishing these [six]

38

factors. If the employee shows that, considering the circumstances, a reasonable person in the employee's position would have felt compelled to resign, the employee has met her burden of proof."). Mercieca contends there is sufficient evidence to support the jury's constructive discharge finding based on the following circumstances.

- "From mid-2009 to early 2010, near the time when Rummel made her sexual harassment complaint, O'Brien, Tannenbaum, and Aulds made unsolicited comments about Mercieca needing a job (O'Brien), suggesting that he look for something else (Tannenbaum), that he apply for a position in Europe (Aulds), that he apply for a position in New Zealand, and that he go to work for a nonprofit organization (Aulds)," and on April 15, 2010, "Aulds told Mercieca he needed to find a new job."

- "In March 2010, Microsoft allowed Rummel, but not Mercieca, to attend a conference where Mercieca's two biggest customers would be present. . . . In August 2010, Aulds, Tannenbaum, and O'Brien began to exclude Mercieca from meetings with his partners, something he had never experienced before."

- "Aulds and others in Microsoft management encouraged Rummel to levy false sexual harassment allegations against Mercieca, resulting in Rummel's May 7, 2010 formal complaint."

- "In August 2010, after never receiving any pushback on vacation requests and with credited time to take, Aulds and Tannenbaum contacted Shields to see if Mercieca's request for time off with his son could be denied on some legal grounds."

- "In August 2010, Aulds emailed Shields and O'Brien about an alleged outburst Mercieca had in the office. . . . According to Aulds a friend of hers corroborated the story and expressed fear for Aulds's safety. . . . However, Mercieca did not act inappropriately."

- "Mercieca stopped going to the office because it was clear to him 'just a bunch of negative, covert things were going on,' and he was concerned 'people could . . . make some things up.'"

- "In September 2010, Aulds was allowed to give Mercieca his FY2010 review, even though she was the subject of a complaint from Mercieca and had lied to upper management and Shea about their past sexual relationship."

- "Aulds, Tannenbaum, and O'Brien—the very people against whom Mercieca leveled his formal complaint—oversaw his FY2010 review and attempted to influence the investigation into Rummel's sexual assault allegations. Aulds, Tannenbaum, and Shields revised Mercieca's FY2010 review to remove all positive peer-review feedback and to add only negative feedback." "Tannenbaum sent an email copying Aulds, O'Brien, and Shields asking Shea to set a quick deadline for completing the ERIT investigation."

- "With respect to Mercieca's FY2011 review, Sahagian testified that Mercieca's performance level was in the middle of the five account managers he supervised. . . . However, O'Brien gave an edict—passed down through Tannenbaum—to rate Mercieca at Level 5, the lowest possible rating. . . . Mercieca was the only Level 5 rating among account managers in Tannenbaum's chain of command. . . .

40

Mercieca should not have been rated at Level 5."

- "As a result of the Level 5 rating, Mercieca received no bonus, no stock grants, and no salary increase for the year. . . . The rating was reflected in Mercieca's personnel file and negatively impacted his future with the company. . . . Without improvement in the rating, termination was likely. . . . Sahagian testified that he probably would have left the company had he received a Level 5. . . . Signs indicated that Mercieca was headed for another Level 5 rating for FY2012."

- "Having been evaluated at Level 5, Mercieca could not transfer to another department without O'Brien's approval."

We examine this evidence and Mercieca's contention that these working conditions would have compelled a reasonable employee to resign. Evidence of events occurring before November 2009 is irrelevant to a constructive discharge finding because Mercieca testified that any changes in work conditions at Microsoft and any retaliation by Microsoft started only after the November 2009 Bass dinner. Nonetheless, even considering evidence of events occurring before November 2009 does not change the outcome of this review.

We begin by examining Mercieca's contention that Aulds, Tannenbaum, and O'Brien said he should look for another job. Mercieca first points to a conference he attended in July 2009. Mercieca performed on stage with a band one evening at the conference. When O'Brien, who is Irish, saw Mercieca later, he told Mercieca: "I could get my friend, Bono, from U2 to give you a job." Mercieca testified that he was "shocked" and asked O'Brien, "why do you think I need a job," to which O'Brien responded, "you might need one soon." No reasonable juror could conclude that, taken in context, O'Brien's off-handed comment would have caused a reasonable person to think he needed to look for another job.

41

Mercieca contends that Tannenbaum suggested "he look for something else." Mercieca testified at trial that, during his February 2, 2010 conference call with Tannenbaum and Aulds, Tannenbaum told Mercieca his "head was not in the game and maybe [he] should be looking to do something else." The lengthy taped conference call was played for the jury at trial. The recording confirms that Tannenbaum did not tell Mercieca he "should be looking to do something else." Nor did Tannenbaum say anything that would have caused a reasonable person to believe he needed to find another job.

About 75 minutes into the February 2 conference call, Tannenbaum asked Mercieca: "I wanna know . . . tell me the place you're in, you know what I mean, where is your head? . . . I wanna know if that alarm clock goes off in the morning and you go oh shit here I go again another fricking day of this." This statement by Tannenbaum is not evidence that Mercieca's "head was not in the game and maybe [he] should be looking to do something else."

Mercieca claims that Aulds asked him to apply for a position in New Zealand in October 2009 when she sent him the following email: "Hey - I haven't heard anything on this but here's the position," and attached a link with the job description. However, this email is not evidence of Aulds asking Mercieca to apply for a position in New Zealand; this email shows nothing more than Aulds forwarding Mercieca information about a job posting.

Mercieca also claims that Aulds asked him to apply for a position in Europe in February 2010 when she sent him the following email: "Here's the job description we discussed, I think Ann-Marie is trying to move quickly so you should at least have a one:one to discuss. You'd be awesome in this! She has all the countries listed below because she's open to positioning anywhere within EMEA. Go do it then you can hire me!" A reasonable jury could not conclude

42

that an email of this nature created an intolerable working environment.

Mercieca further claimed that Aulds told him during a December 18, 2009 meeting that he should "go work for a nonprofit organization." Mercieca testified that, although he had worked on a nonprofit organization's "voluntary board for three years," Aulds told him "out of nowhere" during the meeting: "[M]aybe you need to go work for a nonprofit organization." Without more context, a reasonable juror could not conclude that Aulds's comment would have caused a reasonable person to feel that he had to look for new employment.

Finally, Mercieca asserts that Aulds told him during an April 15, 2010 telephone conversation that "he needed to find a new job." This assertion is not supported by the evidence; the taped telephone conversation played for the jury at trial reveals that Aulds did not tell Mercieca he needed to find a new job.

We next address Mercieca's contention that Aulds, Tannenbaum, and O'Brien excluded him from meetings with his partners. Although Mercieca testified that he was being "moved out" of meetings he was used to attending, he identified only two instances in which he did not attend a meeting. Mercieca testified that Aulds informed him he could not attend a conference in March 2010 because of budget concerns and Rummel would attend the conference instead. Mercieca also testified that he was excluded from an August 2010 meeting with his partner Motion Computing. Aulds informed him that superiors wanted to keep that particular August meeting small and that only Motion's CEO and Microsoft director-level employees would attend.

Mercieca also contends that "Aulds and others in Microsoft management encouraged Rummel to levy false sexual harassment allegations against Mercieca, resulting in Rummel's May 7, 2010 formal complaint." He points to the following as evidence of management's encouragement: "Cell phone records revealed that

43

Rummel and Aulds had talked several times and with increasing frequency shortly before Rummel filed her complaint against Mercieca. The two spoke three times on May 7, 2010—the same day Rummel contacted Shields—with one of those calls lasting 14 minutes." The fact that Rummel and Aulds spoke to each other on the telephone three times on the day Rummel filed her complaint against Mercieca is merely evidence of the fact that the two women talked. The calls constitute no evidence of encouragement to file false allegations against Mercieca.

The record supports Mercieca's contention that he received "pushback" on his request to take a four-week vacation in July and August 2010. Mercieca testified that he received pushback for the first time in response to this request. Emails between Aulds, Tannenbaum, and Shields show that there were concerns about the impact of Mercieca's vacation on upcoming deadlines.

Mercieca also claims the evidence shows that, "[i]n August 2010, Aulds emailed Shields and O'Brien about an alleged outburst Mercieca had in the office." One of Aulds's friends at work corroborated the outburst "and expressed fear for Aulds's safety." Mercieca claims he acted appropriately but thereafter "stopped going to the office because it was clear to him 'just a bunch of negative, covert things were going on,' and he was concerned 'people could . . . make some things up.'" Although Aulds sent an email to Shields and O'Brien alleging an outburst by Mercieca, there is no evidence in the record that Mercieca knew about this email having been sent at the time, or indicating whether he found out about this email during the discovery process in the case. Thus, evidence of this email is not evidence that can be considered in determining whether Mercieca's working conditions were intolerable. Even if we were to consider Aulds's email to Shields and O'Brien, this email is no evidence that a reasonable employee would have concluded it was necessary to stop going to the office because "just a bunch of

negative, covert things were going on," and that "people could . . . make some things up."

Mercieca further contends that in September 2010 "Aulds was allowed to give Mercieca his FY2010 review, even though she was the subject of a complaint from Mercieca and had lied to upper management and Shea about their past sexual relationship." The evidence establishes that Aulds gave him his 2010 performance review while his formal complaint was being investigated, and that Aulds denied having a sexual relationship with Mercieca years earlier until she was confronted by Shea with proof of the relationship. Regardless of whether allowing Aulds to give Mercieca his performance review was a good management decision, it is no evidence of an intolerable working condition considering that this review received the same "Achieved" rating and "70%" ranking that Mercieca had received every year since Aulds became his manager in 2007.

Mercieca next contends that "Aulds, Tannenbaum, and O'Brien—the very people against whom Mercieca leveled his formal complaint—oversaw his FY2010 review and attempted to influence the investigation into Rummel's sexual assault allegations." There is no evidence in the record to support Mercieca's contention that Aulds, Tannenbaum, or O'Brien "attempted to influence the investigation into Rummel's sexual assault allegations." And as stated above, the evidence shows that, even after evaluating Mercieca through the calibration process up his management chain, Mercieca received the same rating and ranking as he had received in the past years under that same management team.

Mercieca also asserts that "Aulds, Tannenbaum, and Shields revised Mercieca's FY2010 review to remove all positive peer-review feedback and to add only negative feedback." The evidence does not support the contention that his management team revised his review to remove all positive feedback from his

45

peers. Mercieca testified that positive peer feedback was "left out" by Aulds; he did not testify that feedback was removed. Even if Mercieca's contention had been correct, he did not know about Aulds's alleged actions until the discovery process in this case; thus, such actions cannot be evidence of intolerable work condition that caused Mercieca to feel compelled to resign from Microsoft. Further, even if Aulds had removed all positive feedback, Mercieca still received the same ranking and rating for fiscal year 2010 as he had received in the past years under that same management team.

Mercieca mentions Tannenbaum's September 14, 2010 email to Shea as evidence of intolerable working conditions. In the email, Tannenbaum expressed concerns that Mercieca "is continuing to raise new claims which is prolonging the final decision," and asked Shea if Microsoft could tell Mercieca to raise all his claims within a certain number of days. There is no evidence that Mercieca knew about Tannenbaum's email until the discovery process. Additionally, it is unclear how Tannenbaum's email could be evidence of intolerable working conditions. The email constitutes no evidence that the investigation into Mercieca's complaint was rushed or improperly conducted. Shea responded to Tannenbaum's email, stating that Microsoft has an open-door policy for employees to raise concerns; that Microsoft takes Mercieca's concerns seriously; and that Shea is diligently working toward finalizing the investigation.

Mercieca also states in his brief that, "[w]ith respect to Mercieca's FY2011 review, Sahagian testified that Mercieca's performance level was in the middle of the five account managers he supervised. . . . However, O'Brien gave an edict— passed down through Tannenbaum—to rate Mercieca at Level 5, the lowest possible rating. . . . Mercieca should not have been rated at Level 5."

Sahagian testified he placed Mercieca in the middle of the five employees he

supervised.  But Sahagian also testified that placing Mercieca in third place out of five employees he supervised did not mean he gave Mercieca a 3 rating.  Sahagian testified that he provided only feedback regarding the five employees but did not give a rating.  He testified that, under Microsoft's calibration process in evaluating and rating employees, all of the employees he supervised could receive a 5 rating for the fiscal year.  Thus, Sahagian's placement of Mercieca in third place out of five employees does not constitute a 3 rating and is not an overall rating comparing all the other members of the Original Equipment Manufactures team.

O'Brien's instruction to Tannenbaum that Mercieca should be given a 5 rating for 2011 occurred after the calibration process was completed, under which each employee is evaluated against a larger group of employees at every seniority level.  Sahagian did not believe Mercieca should have been given a 5 rating. However, evidence of unfavorable or negative performance reviews does not support a constructive discharge finding and thus will not be considered in determining whether working conditions were so intolerable that a reasonable person in the employee's position would have felt compelled to resign.  *See Wal-Mart Stores, Inc. v. Bertrand*, 37 S.W.3d 1, 9 (Tex. App.—Tyler 2000, pet. denied) ("An unfavorable work evaluation does not support a constructive discharge claim."); *Bates v. Dallas Indep. Sch. Dist.*, 952 S.W.2d 543, 551 (Tex. App.—Dallas 1997, writ denied) ("Nor do unfavorable work evaluations support a constructive discharge claim."); *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 178 (Tex. App.—Houston [14th Dist.] 1991, no writ) ("Nor do unfavorable work evaluations support a constructive discharge claim."); *Wu v. M.D. Anderson Cancer Ctr.*, No. 14-01-01111-CV, 2002 WL 31546035, at *1 (Tex. App.—Houston [14th Dist.] Nov. 14, 2002, pet. denied) (mem. op., not designated for publication) ("We have held that derogatory comments resulting from disciplinary

47

proceedings, unfavorable work evaluations, or humiliation or embarrassment stemming from a transfer to a different position are insufficient to support a claim for constructive termination."); *see also Deocariza v. Cent. Tex. Coll. Dist.*, No. 03-06-00653-CV, 2008 WL 2468682, at *8 (Tex. App.—Austin June 19, 2008, pet. denied) (mem. op.) ("[W]e again note that negative performance evaluations are not actionable adverse employment actions.").

As we already discussed above, a reduction in salary can be considered in determining whether a constructive discharge occurred. *Gardner*, 414 S.W.3d at 383; *Perret*, 770 F.3d at 338; *Winters*, 132 S.W.3d at 575. But Mercieca's base salary remained at its existing level following his fiscal year 2011 performance review, though he did not receive a commitment bonus, stock bonus, or salary increase.

Mercieca also contends that "[s]igns indicated that [he] was headed for another Level 5 rating for FY2012." Mercieca testified that Sahagian told him during his midyear checkpoint performance review discussion that he was "trending towards another 5" rating. The midyear review reflects that Sahagian rated Mercieca as being "on track" in four out of six areas of evaluation but also stated that Mercieca is "trending to stack rank low relative to his peers" and needed to improve on revenue and collaborating with others. However, regardless of what the review reflects, Mercieca already had decided to resign at the time he received this midyear review; he sent a resignation letter on February 22, 2012, to Microsoft in which he stated that he considered himself to be constructively terminated. Mercieca also told Sahagian during the review that he was "constructively terminated." Therefore, the midyear review itself cannot be evidence of intolerable work conditions that caused Mercieca to resign.

Finally, Mercieca claims that he "could not transfer to another department

48

without O'Brien's approval" so that "the manager[] about whom he had formally complained would be overseeing his professional future." This could have potentially become a problematic work situation if Mercieca had expressed a desire to move departments or O'Brien had indicated that he would not approve a transfer by Mercieca to another department within Microsoft. Without any evidence that Mercieca tried or wanted to transfer to another division within Microsoft, or that O'Brien would have denied Mercieca's transfer request, the mere fact that Mercieca could not transfer to another division without O'Brien's approval alone does not create an intolerable work condition.

Although not mentioned by Mercieca in his brief, the record contains evidence that Aulds in June 2010 (1) asked Bass Computers general manager Von Cordsen about Mercieca's state of mind; (2) told Von Cordsen that Mercieca was "just overdocumenting things . . . and asking questions of other people . . . to where it just seemed to her that he was extremely paranoid and -- and something was going on;" and (3) asked Von Cordsen if he would talk to Microsoft Human Resources about Mercieca's state of mind. The jury could have concluded that Aulds's inquiry about Mercieca's state of mind and expressing that Mercieca seemed paranoid evidences inappropriate behavior by Aulds because Bass Computers was a Microsoft partner and Mercieca was responsible for the Bass Computers account. Even though Aulds, Mercieca, and Von Cordsen considered each other friends, Mercieca's state of mind was not an appropriate topic for discussion with a Microsoft business partner.

Mercieca also does not mention in his brief that he was asked to produce his boarding passes after he took a trip to England to visit his family. Mercieca testified that, after Aulds was removed as his manager in 2010, she made "a report to Joe Sahagian that [Mercieca] actually w[as] not in England, and she was trying

49

to make it seem like [Mercieca] misinformed Joe Sahagian." Mercieca testified that he had to produce his "boarding passes of Heathrow Airport in London." Although asking Mercieca to present his boarding passes after returning from England was not appropriate, it does not amount to an intolerable working condition.

Having considered the evidence in the record, including the specific evidence Mercieca highlighted, we conclude that there is legally insufficient evidence to support the jury's constructive discharge finding in this case. The evidence shows that (1) Mercieca was not demoted; (2) Mercieca did not experience a reduction in job responsibilities; (3) Mercieca's base salary remained the same, though he did not receive a merit increase, stock bonus, or commitment bonus in 2011; (4) Mercieca was not reassigned to menial or degrading work; (5) Mercieca did not receive offers of early retirement; (6) Mercieca did not experience badgering, harassment, or humiliation by Microsoft calculated to encourage his resignation; (7) Mercieca was not asked to find another job; (8) Mercieca was excluded from two meetings; (9) Mercieca received resistance from management when he announced a month-long vacation in 2010; (10) Mercieca's management team was allowed to give him his performance review for fiscal year 2010 even though it had been the subject of his formal complaint, but the team gave him the same rating he had received in previous years; (11) Aulds asked Von Cordsen about Mercieca's state of mind and if Von Cordsen would talk to Human Resources at Microsoft about Mercieca's state of mind; and (12) Mercieca had to present his boarding passes after taking a vacation to England.

We conclude that this evidence is legally insufficient to support a finding that a reasonable person in Mercieca's position would have considered the working conditions at Microsoft to be so intolerable that he felt compelled to resign. *See*

50

*Haley*, 391 F.3d at 650-51 (holding that "management fabricating deficiencies in [employee]'s work performance and setting an overly strict performance plan for her; threatening to fire her if she did not meet her teamwork goals; micromanaging her; excluding her from HR Department meetings; and ridiculing her in front of her coworkers" was not sufficient evidence of constructive discharge); *see also Bates*, 952 S.W.2d at 551 (affirming summary judgment for employer on teacher's contention that he was constructively discharged when employer transferred him, placed him on probation, froze his salary, and gave him an unsatisfactory rating); *Wu*, 2002 WL 31546035, at *1 (affirming summary judgment in employer's favor on constructive discharge claim predicated on "conditions that . . . must commonly be faced by employees – his workload increased as business grew, a younger person was made his supervisor, files were destroyed that made his work harder, his salary was frozen, and he heard that an administrator wanted to eliminate his job"). Therefore, we conclude that there is legally insufficient evidence in this case to support the jury's constructive discharge finding. Accordingly, we sustain Microsoft's first issue.

## III. Remaining Issues

Having sustained Microsoft's first issue, we need not address Microsoft's remaining four issues nor Mercieca's sole issue on cross-appeal. Without a constructive discharge finding, Mercieca cannot prevail on his retaliation claim and thus cannot recover for any compensatory or exemplary damages relating to his retaliation claim. Nor can Mercieca recover attorney's fees, expert costs, and costs awarded in the trial court judgment.

## CONCLUSION

We reverse the trial court's judgment and render a take-nothing judgment in Microsoft's favor.


/s/    William J. Boyce
         Justice


Panel consists of Justices Boyce, Busby and Brown.